**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald BARLIN, Herbert Frank, Anthony Cuccio, Bruce Erbacher, George Gleckler, Pauline Frank, Milagros Fantauzzi and John Doe, a/k/a "Pepe", Defendants,**

**Milagros Fantauzzi, Ronald Barlin, Herbert Frank, Anthony Cuccio and George Gleckler, Defendants-Appellants.**

Nos. 1019, 996, 997, 1007 and 1018, Dockets 81–1486, 81–1504, 81–1506, 81–1508 and 81–1510.

United States Court of Appeals, Second Circuit.

Argued April 20, 1982.

Decided July 28, 1982.

---

Michael Kennedy, New York City (Michael Kennedy, P. C., Sheryl E. Reich, New York City, of counsel), for defendant-appellant Fantauzzi.

Ronald Rubinstein, Kew Gardens, N. Y., for defendant-appellant Barlin.

Irwin Popkin, Hicksville, N. Y. (Irwin Popkin, P. C., Hicksville, N. Y., Joel Winograd, New York City, of counsel), for defendant-appellant Frank.

David S. Zapp, Leonia, N. J., for defendant-appellant Cuccio.

Gerald B. Lefcourt, Gerald B. Lefcourt, P. C., Erica Horowitz, New York City, (Joshua L. Dratel, New York City, of counsel, on the brief), for defendant-appellant Gleckler.

Peter J. Romatowski, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Gerard E. Lynch, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

RALPH K. WINTER, Circuit Judge:

Ronald Barlin, Anthony Cuccio, Milagros Fantauzzi, Herbert Frank and George Gleckler appeal from their convictions in the United States District Court for the Southern District of New York following a two-week trial before Judge Griesa and a jury. Barlin was convicted of one count of conspiracy to distribute and possess a controlled substance under 21 U.S.C. § 846, and one count of possession and intention to distribute under 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A). Cuccio and Fantauzzi were convicted of one count of conspiracy, Frank on one count of conspiracy and two possession counts, and Gleckler on one count of conspiracy.

We affirm.

## BACKGROUND

The events leading to these convictions began on January 20, 1981 when Special Agent Louis Diaz of the Drug Enforcement Agency ("DEA") met with a confidential informant and together drove to the Greenwich Village apartment of Bruce Erbacher. While Agent Diaz waited in the car, the informant made several trips into and out of the building. Meanwhile, Herbert Frank arrived and entered the building. A short time thereafter, Frank, Erbacher and the informant emerged. After a brief conversation, Frank departed. The informant then returned to the car and handed Diaz a half ounce of 56.2% pure heroin.

Further efforts were made by the DEA to exploit the contact between the informant and Erbacher. On February 10, 1981, following a recorded telephone conversation in which Erbacher agreed to supply the informant with a full ounce of heroin, Diaz, posing as a Philadelphia-based drug buyer, was introduced to Erbacher. Diaz accepted a little less than an ounce of 65.4% pure heroin and then offered to purchase up to a pound of heroin on a weekly basis. Erbacher responded enthusiastically, describing eager sources ready to do volume business.

To corroborate his ability to supply heroin, Erbacher arranged for Diaz to meet one of his sources, a man identified as "Robin." The two met on March 4, 1981 in Erbacher's apartment. "Robin" was in reality Herbert Frank, who also told a tale of networks and sources. His story was even more intriguing, for it included "family," meaning organized crime figures, and kilogram-weight packages of high quality heroin. However, Frank groused about the need for buyers to accept delivery, noting that he had been holding an ounce of heroin for Diaz for over a week. Diaz agreed to purchase the ounce and consummated the deal with Erbacher immediately after Frank had left.

During the next three months, Diaz's liaison with Erbacher and Frank flourished. After some negotiations, Erbacher arranged a mid-April sale of a half-kilogram of heroin for $134,000. The transaction, which was to be shepherded by Frank, was aborted only when Frank refused to deal face-to-face with Diaz. Nevertheless, Erbacher continued to press Diaz and in early May, he called him to report that he, Erbacher, might be able to deal directly with Frank's sources, men identified as "Ron" and "Pepe." On May 6 and 11, Erbacher again called Diaz, offering four ounces of heroin on each occasion. Diaz accepted the second invitation and arranged to buy two ounces on the following day.

Diaz arrived at Erbacher's apartment as planned on May 12, 1981. A conversation ensued in which Erbacher reported that Frank had another eight ounces of heroin waiting in Queens. Meanwhile, Erbacher

delivered the two ounces and Diaz paid the money. While Erbacher was counting the money, Diaz arrested him.

Erbacher agreed to cooperate with DEA and, on the night of May 12, tried to make arrangements to consummate the drug transaction with Frank in Queens. With his phone tapped, Erbacher placed a call to Frank at approximately 5:35 p. m. Pauline Frank answered the phone and informed Erbacher that her husband, Herbert Frank, was not home. Erbacher told her he would call back later. When he did so at 6:30 p. m., Herbert Frank was still out and Erbacher spoke instead to George Gleckler.

This was the first of four conversations which Erbacher would have with Gleckler that night. In each, Gleckler was disturbed. He informed Erbacher that Frank was away "on an emergency" and would not be returning until 2:00 a. m. He stated that an unidentified third party had made a series of calls and was "flippin' out" waiting for delivery of money owed him. With an increasing sense of urgency, Gleckler's calls described a "guy" who was "really pissed" and who had said that if Erbacher knew what was good for him, he would deliver the money right away. Gleckler suggested that Erbacher come to Queens with the money "if [he] ever want[ed] to work with [the third party] again," and he kept pressing Erbacher as to when the money would be delivered to Queens. Erbacher stalled for time, and told Gleckler that he was minding his baby while his wife was out. Exasperated, Gleckler offered himself to come to Manhattan to pick up the money. Erbacher, however, declined and promised instead to deliver it.

Agent Diaz spent the entire night at Erbacher's apartment. On the following day, May 13, 1981, he obtained a warrant for Herbert Frank's arrest, and in the early afternoon he met DEA agents Kobell and Chamberlain in Queens. At 1:30 p. m., Diaz called the Frank apartment. Pauline Frank answered and informed Diaz that Herbert Frank was not home. Thereafter, Diaz and the other agents went to the Frank apartment and drew Pauline Frank out into the hallway. Identifying themselves to Mrs. Frank, the agents asked to enter. She agreed. At that point, a man, later identified as Anthony Cuccio, opened the door to let Pauline in and quickly shut it to keep the agents out. Immediately thereafter, however, the agents were allowed inside.

The agents found Pauline Frank, Ronald Barlin, Anthony Cuccio, and the Franks' daughter Annette in the apartment. A cursory search was made to find Herbert Frank, who was not there. Identification was requested of Barlin who was then detained on the suspicion that he was the "Ron" earlier identified by Erbacher as Frank's heroin source.

Cuccio insisted he had nothing to hide and offered to display his personal belongings. When he and Diaz approached those belongings, Cuccio reached toward a suitcase. Diaz noticed a shotgun stock sticking out of a plastic bag near the suitcase. Diaz seized the gun. Everyone denied ownership. Cuccio was arrested.

At approximately 3:00 p. m., after calling federal prosecutors, Diaz left to secure a search warrant for the premises. The parties have stipulated that the warrant was signed at 6:22 p. m. Confusion exists as to what happened in the interim. The Franks' son, Michael, testified that he came home at approximately 2:30 p. m. and at some point thereafter saw agents searching through his parents' bedroom. Mrs. Frank herself offered conflicting testimony, placing commencement of the search first at approximately 1:15 p. m. and later at some time after 3:00 p. m. A carpenter who had the misfortune to arrive at approximately 5:00 p. m. testified as to clothes strewn around the den, a large room immediately past the foyer.

The agents, however, told a different story. Before Diaz actually arrived with the warrant, he called the apartment to inform his colleagues that the warrant had been granted. Agent Kobell testified that the search didn't begin until Diaz actually returned. Diaz, however, testified that the search appeared to have just begun when

he arrived. In any event, the search disclosed "modest amounts" of 89.8%, 76.6% and 70% pure heroin, two packages of cocaine, a triple beam balance, packaging materials, shotgun shells and handgun ammunition.

At 7:00 p. m., Mrs. Frank was arrested. She, Barlin and Cuccio were removed from the apartment, and the agents remained to inventory the search. At 9:00 p. m., Herbert Frank entered the apartment, along with Milagros Fantauzzi and George Gleckler. Frank was immediately arrested and frisked. A total of $9,600 was found in his boots and over $47,000 in his briefcase. Meanwhile, Kobell attempted to neutralize Gleckler and Fantauzzi. Gun drawn, Kobell ordered Gleckler to empty his pockets, kneel down, and put his hands on his head and cross his legs. The contents of Gleckler's pockets were placed in a bag. Fantauzzi was ordered against the wall, patted down and then asked to expose her waistband to ensure she had no weapons on her person. She consented and no weapons were discovered.

At this time, the three DEA agents were without handcuffs because of previous arrests and they had not finished the inventory. Sometime after frisking the trio, Fantauzzi's pocketbook was noticed. Fantauzzi was between five and 20 feet from the bag. Chamberlain searched the bag and discovered $5,000 and one-half pound of 89.6% pure cocaine.

Gleckler and Fantauzzi were then arrested. Subsequent investigation disclosed that Gleckler's wallet contained keys to a safe deposit box rented by Barlin and two pages of notes made by Gleckler recording various amounts of money paid to various persons and profits taken. On October 23, 1981, the jury convicted each of the appellants.

## DISCUSSION

Appellants claim their convictions violate the Fourth Amendment and allege errors regarding the nature and proof of the underlying conspiracy. They also advance individual grounds for reversal.

Fantauzzi and Gleckler contend that the search of Fantauzzi's pocketbook was illegal while Gleckler also challenges the seizure of his wallet. Fantauzzi and Gleckler claim the District Court erred in failing to give appropriate charges on multiple conspiracies and specific intent. All appellants, save Frank, claim the evidence was insufficient to support their convictions. Finally, Fantauzzi asserts error in the denial of her motion for severance, Frank and Barlin contend the destruction of certain notes by the DEA violated the disclosure requirements of the Jencks Act, 18 U.S.C. § 3500 (1976), and Gleckler argues that the admission of notes taken from his wallet was error and that his conviction was tainted by prosecutorial misconduct.

We consider each of these claims, reject them all, and affirm the judgments of conviction.

### A. Fourth Amendment Claims

#### (1) Fantauzzi

■ Because probable cause with respect to Fantauzzi did not exist until after the pocketbook search, the government seeks to justify the detention and search as valid investigatory measures under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigatory stop and search must be based on a "reasonable suspicion, based on specific, objective and articulable facts, that the individual is involved in criminal activity," *United States v. Delos-Rios*, 642 F.2d 42, 45 (2d Cir.) *cert. denied*, 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981), and entail the minimal degree of intrusion appropriate to the particular circumstances. *Cf. United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). In determining whether such a stop and search is valid, we must view the surrounding circumstances (i) "as a whole, not as discrete and separate facts," and (ii) "through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *Delos-Rios*, 642 F.2d at 45.

■ Fantauzzi arrived with Frank and Gleckler against a background that comported with "the violent nature of narcotics crime," *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir. 1980). Heroin, two shotguns, and ammunition for both shotguns and as yet undiscovered handguns had been found in the Frank apartment. The taped phone conversations indicated that a major narcotics transaction was under way. Frank, a known narcotics dealer whom Diaz had previously met as "Robin," was carrying over $50,000 in cash. Gleckler was the man Erbacher had spoken with in the Frank apartment the night before and who had described the urgent need for money.

Although Fantauzzi was unknown to the agents, we think her detention, the initial search of her person and the search of her pocketbook were reasonable and minimally intrusive. Unlike *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), Fantauzzi was not innocuously present in a crowd at a public place. Instead, she entered in tandem with Frank and Gleckler, whose involvement in an ongoing narcotics transaction seemed apparent. The agents did not have a realistic option of separating her from the others. *Compare United States v. Clay*, 640 F.2d 157 (8th Cir. 1981); *cf. United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981). Without handcuffs, they had to neutralize the suspects and finish the search. Search of Fantauzzi's purse was hardly gratuitous in these circumstances, since "a lady's handbag is the most likely place for a woman to conceal a weapon." *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir. 1973).

Fantauzzi argues that by the time the agents had examined the bag, any reasonable fear should have been allayed. Although there was contradictory evidence as to the precise interval between Fantauzzi's entrance and the search of the bag, Judge Griesa could have credited the agents' testimony that the interval was no more than 15 minutes. However, even if the interval were longer, the mere passage of time did not immunize the pocketbook from search. It would have been unwise for agents who lacked handcuffs and had other work to do simply to have handed Fantauzzi her bag and released her or to have left the bag unsearched. So long as the purse remained unopened, it was a source of danger to the agents and to the suspects as well, whose innocent or unintended gesture in the direction of the bag might have resulted in calamitous consequences. We need not wait for such a tragedy to occur to appreciate the unrealistic nature of Fantauzzi's argument. The rule of minimal intrusion permits whatever efforts are necessary to neutralize a potentially explosive and fatal situation. The steps taken here were well within the permissible range.

### (2) Gleckler

■ The seizure of Gleckler's wallet is clearly valid. Not only did he enter with Frank, a known dealer thought to be in the midst of an ongoing transaction, but there was also independent evidence known to Agent Diaz linking Gleckler to the conspiracy. It was Gleckler's voice which had informed Erbacher on the tapped phone of the "guy . . . flippin' out" while waiting for his money and who had personally offered to drive to Manhattan to collect cash from Erbacher. Even if his detention moved beyond the bounds of a *Terry* stop and was a functional arrest, probable cause existed. Gleckler's Fourth Amendment attack is thus also rejected.

### (3) Barlin and Frank

Barlin and Frank attack the very propriety of the apartment search itself, contending, first, that the evidence supporting the warrant was stale and, second, that the search began before the warrant was actually issued. Barlin also claims there was no probable cause for his arrest. We reject these claims also.

■ The warrant was secured on the basis of Agent Diaz's affidavit of May 13, which relied on statements by Erbacher the day before that eight ounces of heroin were to be found in the Frank apartment. This was against the backdrop of continuing contact between Diaz and Erbacher and Diaz

and Frank indicating that Frank's narcotics business was an ongoing venture. Finally, Erbacher was not simply an informant but a known participant in the conspiracy. Given the reliability of the source and the ongoing nature of the illegal activity, the lapse of 24 hours hardly rendered the information stale. *Cf. United States v. Perry*, 643 F.2d 38, 49–50 (2d Cir. 1981) (three-year gap in evidence did not make earlier acts stale where ongoing business).

■ The issue of whether the search began before or after issuance of the warrant is a question of fact. Both the agents testified that the search began more than one-half hour after Diaz had called the apartment to advise them that the warrant had been issued, and one agent thought the pair had actually waited until Diaz returned. In contrast, Mrs. Frank and her son testified that the agents had begun the search earlier in the afternoon before the warrant had issued.

Judge Griesa resolved this conflict in favor of the government. He found that the search began after Diaz informed the other agents of the signing of the warrant but slightly before he actually arrived with the document.

With respect to the testimony offered by Mrs. Frank, the Court concluded that her story was "a fabrication." Noting that she had initially placed commencement of the search by Agent Kobell at 1:15 p. m., and later, upon learning that Kobell had not arrived until 3:00 p. m., changed her testimony, Judge Griesa concluded that "she was adjusting her testimony consciously and that it was not a mere accident or a mistake as far as timing." His finding is supported by her inability to describe any of the objects which the agents seized. The carpenter testified that clothes were strewn around one room, but that need not have been the result of the agents' search. Judge Griesa's findings are thus not "clearly erroneous." *Cf. United States v. Todisco*, 667 F.2d 255, 260 (2d Cir. 1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982).

■ The sole remaining Fourth Amendment claim is Barlin's contention that there was no probable cause for his arrest. We find his contention baseless. Before Barlin was arrested, the agents knew that (i) his name was "Ron" and thus was likely to be one of Frank's identified sources, *see United States v. Ocampo*, 650 F.2d 421, 424–26 (2d Cir. 1981), and (ii) he had spent a substantial portion of the night in the Frank apartment and thus could have been the angry person awaiting payment for drug deliveries. These facts easily support a reasonable ground for belief of guilt, and this is all that probable cause requires. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *United States v. Webb*, 623 F.2d 758, 761 (2d Cir. 1980).

### B. *Conspiracy Issues*

#### (1) *Multiple Conspiracies*

■ Fantauzzi and Gleckler claim error with respect to the District Court's asserted failure to instruct as to multiple conspiracies. It is by now commonplace that

in order to promote the goal of 'keeping distinct conspiracies distinct,' the court should describe explicitly the possibility of several conspiracies and instruct the jury that in order to convict a given defendant, it must 'find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.'

*United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980) (citations omitted).

Fantauzzi and Gleckler requested that the District Court instruct the jury as follows:

If you find the knowledge, sale, distribution or possession of drugs by a defendant is proof of or relates to a different conspiracy, not the one charged in the indictment, then you must acquit that defendant. The same is true for the weapons and the records seized and introduced. Proof of several separate conspiracies is not proof of the single, overall conspiracy

charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

The Court instructed as follows:

The government alleges that the conspiracy was a conspiracy to deal in both, and it may be that you will find that there was such conspiracy to deal in both, that is, both heroin and cocaine. My only point is it is sufficient if you find that there was a conspiracy to deal in only one. If that is your finding, that is sufficient for the finding of a valid conspiracy under Count One.

I further instruct you that in order to make a valid finding of conspiracy all twelve jurors must agree on what the conspiracy is, if you find that there was one. It is not sufficient if a few of you think there was a conspiracy to sell cocaine and a few others think there was a conspiracy to sell heroin and still a few others think that there was a conspiracy to sell both.

All twelve jurors must agree on the nature of this conspiracy in order to have a valid finding of conspiracy; that is, if you find that there was a conspiracy to distribute both heroin and cocaine, that must be the finding of all twelve jurors; if your finding is a conspiracy just as to heroin, that must be agreed upon by all twelve jurors; or if you find that the conspiracy was just for cocaine, that must be agreed upon by all twelve jurors. That is necessary in order to make a valid finding on that first element regarding the existence of the conspiracy.

Fantauzzi and Gleckler claim the failure to give the requested charge was error.

■ To justify reversal for a failure to give the requested charge, appellants must meet two burdens. They must demonstrate both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge. *Cambindo Valencia*, 609 F.2d at 622. Appellants have satisfied neither of these requisites.

■ Appellants base their argument solely on the fact that the indictments specified a conspiracy involving more than one controlled substance. The mere fact that more than one substance is charged, however, does not mean there are multiple conspiracies. *United States v. Moten*, 564 F.2d 620, 625 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977). Multiple conspiracies exist where the evidence shows separate networks operating independently of each other. *Cambindo Valencia, supra*, for example, involved 27 persons whose activities over four years spanned two continents and indicated at least three separate networks. *See also United States v. Bertolotti*, 529 F.2d 149, 155 (2d Cir. 1975).

In contrast, here there was only one network centering on Frank and emanating through Erbacher to the street. Sources such as Barlin and Cuccio and assistants and couriers such as Fantauzzi and Gleckler had been enlisted. None of the complexity either with respect to persons, lines of communication, or distribution which normally characterizes multiple conspiracies was present.

■ Moreover, the charge fully explored the possibilities opened up by the presence of two drugs. Judge Griesa explicitly instructed that the conspiracy could exist as to either cocaine, heroin, or both; that one of the three alternatives had to be chosen; and that once chosen, each defendant had to be found by each juror to be involved in that specific conspiracy in order to support a verdict of guilt. That was fully adequate.

*(2) Specific Intent*

■ The errors assigned to the Court's charge on specific intent are also meritless. Judge Griesa's charge, read as a whole,

clearly stated the elements of conspiracy. He initially instructed "that a person must . . . participate in some way in carrying out the illegal purpose with at least some knowledge of that illegal purpose and the intention to further it." This was followed shortly by a summary in which these words were repeated virtually verbatim. Finally, to underscore the nature of the required intent, he instructed that

> [m]ere association with other persons who are guilty of a crime does not constitute a crime, even if there is knowledge that the other person is committing a crime.

Fantauzzi and Gleckler argue that this instruction was deficient in that it did not utilize the exact language approved in *United States v. Provenzano*, 615 F.2d 37 (2d Cir. 1980). In *Provenzano*, the District Court had instructed the jury that it had to find that the "defendant knowingly and willfully was an active participant in the unlawful plan with the intention of furthering its objectives." *Id.* at 45. We indicated that the charge given in that case would have been inadequate had "knowingly and willfully" been omitted. *Id.* at 45–46. We did so, however, solely because the District Court there had not instructed that mere association was insufficient to demonstrate the requisite *mens rea*. Since Judge Griesa expressly stated that knowing participation was requisite and that mere association would not suffice, the issue raised by *Provenzano* was not in the present case and the words "knowingly and willfully" were not necessary.

██ Fantauzzi and Gleckler also contend that the District Court erred in failing to repeat its specific intent charge when the jury, during its deliberations, asked the court to "explain the [conspiracy count] with reference to the three parts, [combination, specific intent and overt act]. Is a defendant not guilty if one or two but not all three parts apply?" We are unpersuaded. The jury's question demonstrated no confusion as to the elements of conspiracy. It asked only whether all three elements had to be satisfied to find a defendant guilty. Appellants' reliance on *United States v. Velez*, 652 F.2d 258 (2d Cir. 1981),

is thus misplaced. The jury there asked for "[c]larification on all counts. How does [sic] Counts Two [importing cocaine] and Three [possessing cocaine] differ from Count One [conspiracy]?" *Id.* at 261 n.3. Moreover, Velez's sole defense was that she lacked the specific intent required to convict her of conspiracy. Given that defense and the jury's obvious confusion, we held it error not to have reiterated the charge on specific intent. The question asked here was simple, straightforward and exhibited no misapprehension on the intent issue. No further instruction was thus needed.

### C. *Sufficiency of the Evidence*

██ All appellants except Frank challenge the sufficiency of the evidence supporting their convictions. Fantauzzi relies principally upon the fact that the DEA had never heard of her prior to her arrival at the apartment with Frank and Gleckler on May 13. That is so, but her arrival in not so innocent circumstances, the one-half pound of 86% pure cocaine in her purse along with $5,000 in cash, and the fact that she was listed along with the other conspirators in Frank's records, surely weighs heavily against her. The jury could have readily concluded that Fantauzzi was involved in the ongoing transactions and was transporting pure cocaine to a narcotics headquarters where it would be cut into quantities of lesser purity and readied for ultimate distribution. The sheer quantity of the cocaine and the presence of cash along with her association with Frank and Gleckler surely allowed the jury to conclude she was more than an innocent courier, *compare DeNoia v. United States*, 451 F.2d 979 (2d Cir. 1971), and more than an unfortunate associate who was present on the scene but who had engaged in no criminally "purposeful" behavior, *United States v. Johnson*, 513 F.2d 819, 823–24 (2d Cir. 1975).

Even if the proof against Fantauzzi showed only a "single act," *DeNoia, supra,* the nature of this conspiracy was such that a single act of the kind proven here supports an inference of guilt. The conspiracy was inherently narrow and centered around

Frank. Under these circumstances, the proven possession and apparent transportation "forms a larger proportion of the entire scheme." *United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir. 1974). Viewed in context, therefore, the "qualitative nature" of the act permits the "inference of knowledge of the broader conspiracy [since] the single act itself shows so much familiarity with or high level participation in the overall conspiracy, . . ." *Id.*

 The case with respect to Gleckler is equally strong. Although he casts himself in the role of an innocent friend collecting for Frank, the evidence clearly permitted a contrary finding. Gleckler stayed in the Frank apartment for much of the night of May 12 and was persistent in pressing Erbacher to deliver money owed to Frank's sources. He made these pleas as Barlin and Cuccio stood nearby, demanding payment for previously delivered narcotics, or so the jury could have found. The next day, Gleckler arrived with Fantauzzi, the latter carrying drugs and cash. In Gleckler's wallet were notes which included notations such as "$Herbie4000," "$7500-Herbie," and "$5000-me." Finally, he possessed a key to a safe deposit box registered to Barlin. Under these circumstances, imputing knowledge of, and participation in, the conspiracy to Gleckler is hardly impermissible.

In Barlin's case, the evidence is perhaps less direct but still quite sufficient. Frank had verbally identified one of his sources as "Ron" and his records contained numerous references to a "Ron." Barlin admitted to having been in and out of the apartment all night, justifying an inference that he was waiting for Frank, who was carrying over $50,000, either as the source or the strongman. Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the proof against Barlin was sufficient.

Cuccio's case is closer. Had his presence throughout the night of May 12 and through the morning of May 13 not been established, his activity on the afternoon of the 13th might lack any "purposeful" cast.

*Johnson*, 513 F.2d at 823–24; *see also United States v. Burgos*, 579 F.2d 747 (2d Cir. 1978). However, his presence through that tense night, together with an apparent attempt to grab a shotgun after the agents arrived and the presence of the phone numbers of the other defendants in his wallet, is sufficient to support an inference that Cuccio was one of the visitors seeking to collect, or aid in collecting, money for delivered narcotics.

**D. Other Issues**

Three additional issues require attention. Fantauzzi claims the Court erred in failing to sever her trial from that of the other defendants. Frank and Barlin claim the judgment should be reversed because the government destroyed certain of the agents' rough notes which should have been produced under the Jencks Act. Finally, Gleckler asserts that admission of the notes taken from his wallet and certain statements of the prosecutor on summation constitute reversible error.

 As an alleged co-conspirator, Fantauzzi was properly joined in the indictment. Rule 8(b), Fed.R.Crim.P. (1981). She argues that Judge Griesa's denial of her motion for discretionary severance was error. We disagree. As we said recently,

> the decision to grant or deny a severance . . . is within the broad discretion of the trial court and will not be overturned absent some showing that the defendant suffered substantial prejudice due to the joint trial.

*United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982), quoting *United States v. Weisman*, 624 F.2d 1118, 1129–30 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). Moreover, "[i]n deciding whether the trial court's action was correct, a reviewing court should consider the need for judicial economy and the extent to which the judge instructed the jury to consider the evidence separately with respect to each defendant." *Losada*, at 171. A separate trial of Fantauzzi would have involved substantial duplication of effort. Moreover, Judge Griesa more than once ad-

monished the jury "that the question of guilt is an individual question which you must consider as to each defendant and as to each count in which the defendant is charged." The jury's failure to reach a verdict as to another alleged co-conspirator, Pauline Frank, indicates that this instruction was heeded. Appellant's claim that she was convicted because of prejudicial spillover overlooks the substantial evidence pointing specifically to her guilt, *i.e.*, her possession of one-half pound of cocaine.

Barlin and Frank's claim that certain notes were withheld in violation of the Jencks Act, 18 U.S.C. § 3500, is no more persuasive. These include Agent Diaz's notes concerning his surveillance on January 20, his meeting with Erbacher on March 4, and Kobell's pedigree notes of conversations with Pauline Frank, Cuccio, two visitors and a telephone caller on May 13. Diaz's notes were destroyed after their contents were fully incorporated in a formal report which was given to the defendants. Kobell's notes, however, appear to have been lost and as a result the government did not elicit any testimony from Kobell as to the pedigree information or the substance of the phone call.

 As to Diaz's notes, appellants do not question that the notes were made part of the agent's formal report. That being the case, the notes need not have been preserved and their destruction violated no Jencks Act right. *Compare United States v. Sanchez*, 635 F.2d 47, 65–66 & n. 20 (2d Cir. 1980) *with United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). As to Kobell's notes, the defendants suffered no prejudice as a result of the apparent loss, the government having insulated the proceedings from any taint by not eliciting testimony from Kobell on the subjects covered. *Cf. United States v. Grammatikos*, 633 F.2d 1013, 1021–22 (2d Cir. 1980) (loss of evidence relating to charge on which indictment not sought is not prejudicial).

 The final attacks levelled against these convictions originate with Gleckler.

First, he claims that the admission into evidence of two pages of notes from his wallet was prejudicial. The first page, Government Exhibit GX 600B–1, contained numerous references to dollar figures ranging from $300 to $230,000 and notations as to weights (e.g., "K," possibly meaning "kilogram") and profits (e.g., $230,000—net profits"). The second, Government Exhibit GX 600B–2, contained scattered sets of numbers along with a numbered list of prices starting with "1–$11,000" and ending with "7–$54,100." Within that list, items four, five and six read: "4–$7,500–Herbie," "5–$5,000–me," "6–Herb$4,000."

The indictment initially included marijuana and other drugs, as well as heroin and cocaine. After the second defense rebuttal summation, however, the judge suggested dropping all the charges with respect to marijuana and other drugs. The court then recessed, and the following morning the government dropped those charges. At this point, Gleckler's counsel summarized, and, taking advantage of the decision just made, claimed the figures on the first page of GX 600B–1 could have involved only marijuana, given the low amounts received. The government attempted to rebut this assertion by arguing that there were many figures on both pages of notes and that together the notes supported the inference of a conspiracy and Gleckler's involvement in it. Defense counsel objected to this and moved for a mistrial claiming that the figures on GX 600B–1 could relate only to marijuana. Agreeing that the figures on that page did not refer to heroin or cocaine, the District Court instructed the jury that GX 600B–1 could be considered "only for the purpose of showing connection between individuals" and could not be considered as "actually a calculation of either heroin or cocaine transactions or figures."

Given that instruction, the notes were properly admitted. The Court shielded the jury from any tainted use by giving the limiting instruction almost immediately after the defendant's objection.

Gleckler alleges several instances of prosecutorial misconduct, only one of which merits discussion. He claims the government improperly appealed to the jury's passion and emotion in characterizing their job as "the one occasion on which you have a duty to do something about the drug traffic in our community." This is one of a genre of comments which appears designed to divert rather than focus the jury upon the evidence and does not belong in summation. Were the proof as to Gleckler weaker or had the appropriate instruction distinguishing between argument and evidence not been given, the issue might have assumed a prominence it fortunately lacks. *See United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981), *petition for cert. denied,* —— U.S. ——, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). It affords us no reason to reverse as to Gleckler.

## CONCLUSION

For the reasons stated above, the judgments of conviction as to each of the appellants are affirmed.