UNITED STATES of America,

v.

Geraldo HERNANDEZ, Defendant.

No. 89 Cr. 999 (MBM).

United States District Court,
S.D. New York.

June 11, 1990.

Christopher P. Reynolds, Asst. U.S. Atty., New York City, for U.S.

Barry C. Scheck, Lawrence A. Vogelman, Ellen Yaroshefsky, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendant Geraldo Hernandez was arrested by Deputy U.S. Marshals on December 11, 1989 pursuant to a probation violation warrant issued in the Southern District of Florida based, *inter alia,* on his possession of a 12 gauge shotgun and a .357 magnum revolver. The arrest was effected in an apartment in which were present also two unidentified males and Betty Barrow, a friend of Hernandez's. Hernandez has moved to suppress items seized at the time of the arrest which the government intends to introduce at trial, the list of which reads like the property master's inventory for a play about a narcotics dealer: a .357 magnum revolver (which provides the basis for the underlying charge in this case and bears a serial number different from the one that gave rise to defendant's probation violation charge in Florida), the six bullets found therein, a triple beam Ohaus scale, a beeper, a cellular telephone, a quantity of currency, and a Florida driver's license bearing defendant's picture and a name different from his own. The loaded revolver was found when one of the arresting officers ran his hand under the mat-

tress of the bed on which Barrow had been seated and near which she lay handcuffed. The other items were found elsewhere in the apartment. Because the testimony at a suppression hearing on March 20 and 26, 1990 convinces me that this evidence was seized pursuant to constitutionally permissible precautions incident to the lawful arrest of defendant, the motion is denied.

## I.

At some time after November 1, 1989, Inspector William Scott, a Deputy U.S. Marshal in the fugitive apprehension squad with about 20 years of experience, learned that the FBI had executed a search warrant at an apartment previously occupied by Hernandez and found the shotgun and revolver that gave rise to the probation violation charge, along with narcotics paraphernalia. Based on that, and on Hernandez's prior conviction in Florida for unlawful trafficking in weapons, he considered Hernandez highly dangerous and likely to be armed. On December 11 he learned that Hernandez was residing on West 36th Street between Ninth and Tenth Avenues and driving a gray Cadillac with the license plate AWG 799. Carrying the Florida warrant for defendant's arrest, he and Deputy U.S. Marshal Jack McCallum began canvassing superintendents of buildings on that block, showing them a picture of Hernandez, and learned that Hernandez in fact was living in apartment 2–R at 412 West 36th Street. (Tr. 17–20).

They sat in their parked car for several hours until they saw a gray Cadillac bearing license plate AWG 799 travel east on 36th Street and enter a parking lot on Ninth Avenue. Scott "observed Geraldo Hernandez exit the driver's side, carrying a black attache case and something else. I also noted two unidentified males exit the passenger side of the same vehicle." (*Id.* at 21) As the trio walked toward 412 West 36th Street, Scott noted that Hernandez "kept pulling up his belt, like something was falling," which suggested defendant was carrying a gun, and that the two males followed behind him, apparently as "his backup to intervene in case there was any trouble on the street." (*Id.* at 22)

Scott called for backup of his own, which arrived in the person of about ten deputies. He briefed the newly arrived deputies on Hernandez's background and divided his force into three teams: a containment team to assure that the subject did not escape the building, itself divided in two to cover both the roof and the window of Hernandez's apartment; an arrest team "to control the occupants in the apartment to avoid any kind of armed confrontation"; and a "search team ... to protective sweep to make sure there was no weapon within reach or any hidden subject in the closet or other place in the apartment." (*Id.* at 25)

After the occupants of the apartment failed to respond to two knocks and Scott's identification of himself and the others as "police," the deputies used a hydraulic door opener to gain rapid access to the apartment. Scott and others saw Hernandez straight ahead of them in the living room and arrested him. As they entered, Scott saw Hernandez toss a bag toward the bathroom. The bag contained currency.

Deputy U.S. Marshal Timothy Hogan, his weapon drawn, entered a bedroom immediately to the right of the apartment door, where he found Barrow seated on the bed. He told her to raise her hands, and then put his hand on the small of her back and handcuffed her, placing her face down between the bed and a dresser. As he did so, and while crouched over her, he ran his hand across the top of the bed, underneath the bed, and between the mattress and the box spring to assure that there were no weapons within her reach at the time or that could be within her reach should he place her on the bed. He had planned to place her on the bed because it was easier to see her there than on the floor, it was more comfortable, and she was blocking access to the remainder of the room so long as she lay between the dresser and the bed. As he ran his hand between the mattress and box spring, he felt and removed the gun. He called over his shoulder "gun" to notify other deputies that he had found a weapon, and simultaneously emptied the

weapon, placing the bullets in his pocket and the gun in his belt. (Tr. 162–70)

Barrow, called by the defendant, testified at the hearing that she had terminated a romantic relationship with the defendant by the date of the arrest, and was present in the apartment only to give Hernandez the title to an automobile. She testified that no gun was seized while she was in the bedroom, thereby necessarily suggesting that the gun was recovered after she had been taken out of that room. (Tr. 226–30) However, Barrow's testimony in this regard is suspect not only by virtue of her association with defendant but also as the result of the numerous contradictions and improbabilities in her testimony, including the contradictions between her testimony at the hearing and her testimony before a grand jury as well as her claim that she had no suspicions of Hernandez's illegal activities despite his frequent absences for days at a time while they were living together, accounted for only by his claim that he was driving a cab. (Tr. 236–50) With respect to the circumstances surrounding recovery of the gun, she was unworthy of belief.

After placing Barrow in the custody of another deputy and attending to other duties outside the apartment, Hogan returned and noticed the cellular telephone on top of a bookcase in the living room, and pointed it out to Scott, who seized it; the telephone appeared to be the same one Scott had seen Hernandez carrying on the street. (Tr. 171–74; 47–48) Also found apparently in plain view in the apartment were the beeper and the driver's license. (Tr. 37–38, 44–45) Two agents who opened a closet in the living room where Hernandez was arrested found the triple beam scale. (Tr. 36–37)

## II.

Hernandez bases two arguments on these facts. First, he argues that the conduct of the marshals in the circumstances described above exceeded the scope of the "protective sweep" incident to the arrest of Hernandez, permitted under *Maryland v. Buie*, —— U.S. ——, 110 S.Ct. 1093, 108

L.Ed.2d 276 (1990) and related cases. Second, he argues that the seizure of evidence necessarily resulted from a warrantless search of Hernandez's apartment that was not justified by exigent circumstances. He concludes that the evidence therefore must be suppressed. For the reasons set forth below, I believe Hernandez is wrong in his first argument; there is no need to reach the second.

*Buie* is only the most recent of a long series of cases in which the Supreme Court has tried to strike a balance that would protect both the safety of law enforcement officers and the Fourth Amendment rights of citizens in the unruly circumstances that attend confrontations between those officers and potentially violent criminal suspects. Those confrontations have included investigative stops on the street, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and on the highway, *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), execution of search warrants, *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), and arrests. *Buie, supra; Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In each instance, the Court faced the issue of what steps a law enforcement officer may take with respect to either a person or a place, whether by way of search or detention, in order to assure safety or, in the case of an arrest, prevent destruction of evidence, without engaging in an unreasonable search or seizure.

Thus in *Terry*, the Court held that when a police officer, drawing "specific reasonable inferences ... from the facts in light of his experience," concludes that "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest," 392 U.S. at 27, 88 S.Ct. at 1883, may conduct a search "reasonably designed to discover guns ... or other hidden instruments...." *Id.* at 29, 88 S.Ct. at 1884. In *Long*, the Court extended that principle to "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden ... if the police

officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049, 103 S.Ct. at 3481, quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. "In a sense, *Long* authorized a 'frisk' of an automobile for weapons." *Buie*, 110 S.Ct. at 1097.

Although the Court refused in *Chimel* to sanction the search of defendant's entire house in the course of a burglary arrest, it did conclude that "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use" as well as "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course be governed by a like rule." 395 U.S. at 763, 89 S.Ct. at 2040. In *Buie*, the Court held that an officer arresting a suspected armed robber in the latter's home has an interest analogous to that protected in *Terry* and *Long*, and may look about the home "to assure themselves that the house in which the suspect is being or has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." 110 S.Ct. at 1098. The Court recognized also that, "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* Accordingly, the Court held not only that the officer in question was justified in looking in the basement whence had come the defendant and where the officer then saw incriminating evidence in plain view, but also "that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."

*Id.* Finally, in *Summers*, the Court recognized that even in the absence of specific evidence of the record of potential harm to police executing a search warrant, they were justified in detaining the occupants of the premises where the search was being conducted while it was ongoing. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." 452 U.S. at 702–03, 101 S.Ct. at 2594.

The circumstances of this case fit comfortably within the principles set forth above. The deputies had a warrant for a fugitive whose premises previously had been found to contain weapons, and who conducted himself on the street just before the arrest in a fashion to suggest he was armed. He was accompanied by two apparent cohorts. Once inside the apartment, in the unfamiliar and hostile environment that constituted Hernandez's "turf," the deputies encountered Barrow, whom they had not seen on the street but who there was every reason to believe was in league with Hernandez. Like the officers executing the search warrant in *Summers*, the deputies had every reason to "routinely exercise unquestioned command of the situation." 452 U.S. at 702–03, 101 S.Ct. at 2594.

■ In analogous circumstances, a woman who came upon the scene "against a background that comported with 'the violent nature of narcotics crime,'" *United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982), quoting *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980), although previously unknown to the agents, was properly detained and her pocketbook appropriately searched. *Id.* Like that woman, and unlike the bar patrons impermissibly searched in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), Barrow "was not innocuously present in a crowd at a public place." *Id.* Although the deputies here, unlike those in *Barlin*, did have handcuffs, there was every reason to assure that the area immediately around Barrow was free of weapons. If Barrow were left unattended even for a short peri-

od of time and knew where the gun was, it would not be an impossible task even for one handcuffed from behind to work her hands between the mattress and the box spring and grab the weapon. In any event, the luxury of hindsight does not give me the right to engage in "unrealistic second-guessing" about Barrow's manual dexterity. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). That Barrow herself, unlike the woman in *Barlin*, eventually was not arrested, and that the search disclosed evidence incriminating of Hernandez rather than of her, does not make the search of the area immediately around her any less reasonable. The seizure of the pistol and the bullets it contained accordingly was proper.

■ The seizure of the scale is directly validated by the holding in *Buie* that arresting officers may search a closet immediately adjoining the place of arrest, as was the closet in this case. 110 S.Ct. at 1098. The remaining items—the bag of money, the beeper and the driver's license—apparently were in plain view when the deputies entered the apartment and there was probable cause to believe they constituted evidence of a crime, albeit not the one for which Hernandez was being arrested. Accordingly, the seizure of those items as well was proper. *Horton v. California*, —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); see *Buie*, 110 S.Ct. at 1096.

For the reasons set forth above, the motion to suppress is denied.

SO ORDERED.