**UNITED STATES of America,**

v.

**Guillermo Vallejo MORALES, Defendant.**

**No. 82 Cr. 0441 (PNL).**

United States District Court,
S. D. New York.

Oct. 4, 1982.

Asst. U. S. Atty., Warren Neil Eggleston, New York City, for plaintiff.

Lawrence M. Herrmann, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

Defendant moves to suppress evidence found by DEA agents in a nylon bag that was in the defendant's possession at the time he was stopped by DEA agents, immediately prior to his arrest. An evidentiary hearing was held on July 21, 1982, at the conclusion of which I made findings of fact and directed that briefs be submitted. The motion to suppress is now denied.

*Facts*

The government's principal witness at the hearing was Agent Richard L. Moser of the Federal Bureau of Narcotics. Agent Moser testified that, in the course of an investigation of large scale heroin smuggling into the United States from Italy, he became aware of the name "Lidilia Vergara." Her telephone number had been found on a person arrested for involvement in heroin smuggling. Transcript at 9, 10 (hereinafter cited as "T."). Thereafter, in 1981, the name was found in the personal telephone book of Giuseppi Gallina, currently under indictment for the shipment of about 10 kilograms of heroin into the United States from Italy. T. 9, 10. The listing there was associated with the name "Salvatore Calabria." T. 10. Calabria is presently under indictment for smuggling and is a fugitive from justice. T. 8.

Pursuant to a court order, a pen register was installed on Vergara's phone, which had been traced to an apartment on West 46th Street in New York. T. 10. A review of the telephone records revealed telephone calls to a supermarket 55 blocks away from the apartment. T. 10, 11. Agent Moser testified that the market is owned by an individual believed to be involved in heroin smuggling. T. 10. He believed that the group on which the investigation focussed was responsible for smuggling perhaps as much as forty kilograms of heroin into the United States. T. 9.

On June 3, 1982, Agent Moser went with a Special Agent Coleman of the Drug Enforcement Administration to the apartment that they had identified as that of Lidilia

Vergara. T. 12. In the vestibule of the apartment building, they spoke with an unidentified man who had a key to the building. T. 13. This man informed them that a woman named Lidilia and a man were living in the apartment. T. 13. He also reported heavy traffic to and from the apartment. T. 14–15. Moser testified that, in his experience, heavy traffic in a residential apartment can be an indication of narcotics activity. T. 17.

The agents went to the apartment, knocked on the door and identified themselves as police officers. T. 15. A few minutes passed before a woman who identified herself as Vergara answered the door. T. 15. Vergara admitted the agents into the apartment to question her. T. 15. When Agent Moser heard a sound in another room, he asked if anyone else was in the apartment. T. 15. Vergara answered that her husband was the only other person there. T. 15. Shortly thereafter, a man walked through the room in which the agents were questioning Vergara. T. 16. Vergara identified him as her brother-in-law. T. 16. After a short time, the agents asked Vergara to come to their office for questioning and she agreed. T. 16. According to the agent, she seemed pleased that the agents would be leaving. T. 18.

After the agents and Vergara left the apartment, Agent Moser drove the car around the block and positioned it at the corner of 46th Street so that he could see the entrance of Vergara's building. T. 18. The two agents sat in the front seat and Vergara sat in the back. Within a few minutes, the agent spotted three men leaving the building. T. 18. One of the men was the man Vergara had identified as her brother-in-law. T. 18. The men began walking westward toward the car. T. 18. As they approached, Vergara said something in a loud voice in Spanish and appeared to become agitated and disturbed. T. 19–20. Agent Moser testified that when the three men noticed the car, they stopped and appeared confused. T. 24, 28. He testified that the defendant, who was carrying a nylon handle bag on his shoulder, crossed 46th Street. T. 24. He characterized the group's course as an "evasive, fragmented crossing." T. 66.

Agent Moser, who had moved the car up the block, now got out of his car and approached the defendant, saying, "Hey, I want to ask you some questions" or something similar. T. 29. The defendant then removed the bag from his shoulder. T. 29. As he did so, the bag brushed Agent Moser's arm. T. 29. Moser felt a hard object in the bag strike his arm. He then ordered the defendant to put the bag down. T. 29, 39, 41. He told the defendant to move away from the bag and the defendant did so. T. 29, 39. Moser did not draw his weapon, but he exposed it to view. T. 39.

Moser then reached down and opened the duffle bag. T. 29. He first pushed aside some clothing, T. 84, and then saw some thermos bottles and a paper bag partially concealing some money. T. 29. Pushing a bit further into the bag, he saw a scale that was also partially concealed by a bag. T. 29. Toward the bottom of the bag, Agent Moser saw a paper bag, partially opened. T. 29. Inside the bag was a clear plastic bag containing white powder. T. 29–30. At that point, he drew his weapon and ordered the men against the wall. T. 30.

Moser walked back to his car and placed the bag on top of it. T. 30. He again went through it quickly. T. 30. He then patted down the three suspects and told Agent Coleman to radio for assistance. T. 30.

Vergara and the three men were all brought to the agents' offices for processing. T. 30–31. At headquarters, the defendant was searched and a small quantity of cocaine was found on his person. T. 78. The contents of the bag were removed. T. 31. When the thermos bottles were opened, they were found to contain packets of cocaine wrapped in paper. T. 31. The bag also contained strainers, T. 35, some laminated plastic cards, T. 31, and a long handled spoon, T. 35. Agent Moser testified that these last articles are used to process cocaine. T. 32, 36. A small bag was found to contain $890 in one dollar bills. T. 34. The white powder that Agent Moser saw on

the street was ultimately found to be non-narcotic.

Finally, on cross-examination, Moser testified that Agent Coleman had remained in the car until after he had placed the suspects under arrest. T. 71. He testified that, at the time of the stop, he did not know what Agent Coleman was doing or where she was, T. 70–71, and that he was concerned for her safety as well as his own when he approached the defendant on the street. T. 71.

Agent Coleman's testimony basically confirmed that of Agent Moser up until the time he approached the defendant. She testified that she was thereafter occupied pacifying Lidilia Vergara and could not say what had occurred. T. 106–07. When she next focused on the street, Agent Moser had his gun drawn and was telling the men to move against the wall. T. 107.

The only witness for the defendant was Ariosto Gumercindo Vergara, Lidilia Vergara's brother. He testified that he had not left the building with the defendant. Rather, he and his wife had met the defendant and another man outside the building. T. 131–32. The four of them then walked down the street together for some distance and then separated. T. 132–33. He further testified that Agent Moser "tore the bag off the shoulder" of the defendant. T. 133. Finally, he testified that Lidilia Vergara had been translating the agents' instructions into Spanish when she spoke out loudly while the three men were on the street. T. 134.

At the end of the hearing, I made certain findings of fact. I first stated that, as to any inconsistencies concerning what happened on the street, I was disposed to accept Agent Moser's version of events over that of Agent Coleman, whose attention was otherwise directed. T. 155. Agent Moser was the agent most closely observing the suspects at that time. T. 155. I found that Agent Moser did have facts supporting a reasonable suspicion that the persons he stopped were conducting criminal activity, T. 152, and therefore had an appropriate basis for a *Terry* stop. T. 152. After detailing the evidence on which I based that finding, T. 152–57, I withheld decision on the validity of the various searches to permit both sides to submit legal memoranda on certain issues. T. 157–67.

*Discussion*

The government conducted searches on four occasions during the course of events described above. They were: (1) the initial curbside search; (2) the second search of the bag after Agent Moser had placed it atop the car; (3) the search of the defendant's person after his arrest; and (4) the headquarters search of the bag.[1] The government contends that the initial curbside search of the duffle bag was lawful as part of a weapons search incident to a *Terry* stop, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It relies on a number of theories, including search incident to arrest, to justify the subsequent search of the duffle bag at DEA headquarters. The defendant contends that the agents lacked the reasonable suspicion requisite for a *Terry* stop, that the agents search of the duffle bag was in fact not a search for weapons, and that *Terry* does not authorize a search of the bag even for weapons. The defendant further contends that the headquarters search cannot be justified as a search incident to arrest or by any other exception to the warrant requirement.[2]

▮ I find that Agent Moser had "reasonable suspicion, based on specific, objective and articulable facts, that the [defend-

1. A search of Lidilia Vergara's apartment was also conducted. T. 126. This search was apparently consented to by Ms. Vergara. T. 126. Its legality is not at issue here other than to the extent that the government concedes that if the contents of the duffle is suppressed, evidence from everything that occurred thereafter should be suppressed. T. 5.

2. Neither the government nor the defendant has directed any argument to the lawfulness of the second street search or the search of the defendant's person. I find them both to have been lawful as searches incident to arrest. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *infra* pp. 224–225.

ant was] involved in criminal activity." *See United States v. Delos-Rios,* 642 F.2d 42, 45 (2d Cir.), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981). Agent Moser was entitled to rely on the following facts, among others:

(1). Lidilia Vergara's name had been found in the personal telephone book of Giusseppi Gallina, and on another person who had been arrested for heroin smuggling.

(2). The entry in Gallina's phone book was associated with the name of Sal Calabria, a fugitive from justice in a heroin related case.

(3). Additional information, including telephone records, linked Vergara to heroin trafficking.

(4). An unidentified person with a key to Vergara's building reported heavy traffic to and from Vergara's apartment.

(5). After the agents announced themselves at Vergara's apartment, a period of time passed before Vergara answered the door.

(6). Vergara initially told the agents that only one other person, a man, was in the apartment. The agents later learned that at least two men were in the apartment. Still later, they saw three men on the street apparently leaving the apartment.

(7). Vergara seemed anxious to get the agents out of the apartment.

(8). The men left the apartment carrying a bag, shortly after the agents' departure.

(9). Vergara's demeanor changed suddenly to one of alarm when the men were spotted on the street.

(10). The three men appeared confused in their reactions when they spotted the agents.[3]

---

3. There is a dispute as to whether the men sought to avoid the agents. The government does not contend that the suspects' course constituted a retreat that "transformed . . . already reasonable suspicions into probable cause to arrest." *Sibron v. United States,* 392 U.S. 40, 66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Gomez,* 633 F.2d 999, 1007 (2d Cir.

Agent Moser also had good reason to suspect that the defendant was armed. According to the available information, if the defendant was involved in the drug trade at all, he was involved in large scale importation and distribution of illicit drugs. He was no mere consumer. "[T]o 'substantial dealers in narcotics,' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

The likelihood that the defendant was armed supports Agent Moser's testimony that he did in fact fear that the bag contained a weapon. Although the list of hard objects that might possibly be contained in a duffle bag is long, the agent's suspicions might reasonably have increased when the bag struck his arm and he felt a hard object inside. That Agent Moser may have recognized that a search of the bag might also reveal narcotics does not contradict or nullify his right, in the interest of his safety, to check the bag for weapons.

The government points to a number of Court of Appeals decisions in arguing that the curbside search for weapons was within the limits of *Terry.* In *United States v. Poms,* 484 F.2d 919 (4th Cir. 1973), the court upheld the admissibility of evidence found in the defendant's shoulder bag during the course of a *Terry* search. The police had received specific information from a reliable informant that the suspect always carried a weapon in his shoulder bag. *Id.* at 921. The suspect had his hand on the shoulder bag, which was one third open, when the federal agents approached him. *Id.* at 920. In deciding that the search was lawful, the court relied on the likelihood that the bag contained a weapon and on the limited nature of the search. *Id.* at 921, 922. The court noted that there was "no

1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Soyka,* 394 F.2d 443, 453–54 (2d Cir. 1968) (*en banc*), *cert. denied,* 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969). I conclude here only that the suspects' conduct was sufficiently abnormal to increase the agent's already reasonable suspicions.

evidence that the agent engaged in a general or exploratory search." *Id.* at 922.

In *United States v. Walker,* 576 F.2d 253 (9th Cir. 1978), *cert. denied,* 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 51, the court upheld the *Terry* search of a large purse. Narcotics agents approached the appellant, Walker, and the owner of the purse, Nelson, and ordered them to "hold it." 576 F.2d at 255. Nelson continued walking. At the second command, she stopped. *Id.* An agent then took her purse as she was reaching into it. *Id.* He felt the outside of the purse and detected several large, hard objects. *Id.* Upon opening the purse, he found narcotics but no weapons. *Id.* The court found that "the agents acted reasonably for their protection in searching the purse for weapons." *Id.* at 256.

In *United States v. Johnson,* 637 F.2d 532 (8th Cir. 1980), the court upheld the admissibility of a sawed-off shotgun found in the course of a *Terry* search. At the time of the search, a duffle bag was three or four feet from the suspect. 637 F.2d at 535. A cloth-covered object protruded from the top of it. *Id.* at 533. One police officer patted down the suspect. *Id.* Another grabbed the cloth covered object, which he believed to be a gun. *Id.* Removing the cloth, he found the stock of a weapon. *Id.* He then withdrew it from the duffle bag. *Id.* at 534. The court concluded that the seizure of the gun was justified under *Terry.* *Id.* at 535. The court relied on the accessibility of the weapon to the suspect and the limited nature of the intrusion. *Id.* It noted that the officer "did not conduct a general exploratory search for whatever evidence of criminal activity he might find." *Id.*

In *United States v. Vigo,* 487 F.2d 295 (2d Cir. 1973), the Second Circuit relied on *Terry* to uphold the search of a handbag. Federal agents had stopped a car in which the defendant was a passenger. 487 F.2d at 298. The court observed that a "handbag is the most likely place for a woman . . . to

conceal a weapon." *Id.* The court also noted that the search did not "spill over into an unrelated and therefore unreasonable search for evidence." *Id.* Notwithstanding the court's explicit reliance on *Terry, id.,* the facts clearly indicate that the defendant was under arrest at the time of the search.[4] *Id.*

The recent case of *United States v. Barlin,* 686 F.2d 81 (2d Cir. 1982) is more supportive of the lawfulness of the search at issue here than any of the cases cited above. In that case, defendant Fantauzzi entered an apartment along with alleged coconspirators while federal agents were doing an inventory of the apartment after arresting other coconspirators. at 85. She was immediately ordered against the wall, patted down and asked to expose her waistband. *Id.* About 15 minutes later, the agents noticed Fantauzzi's handbag about fifteen to twenty feet from her. *Id.* at 86, 87. An agent searched the bag and discovered cash and cocaine. *Id.* at 86. The Second Circuit ruled that the search of the handbag was within the scope of *Terry.* *Id.* at 86–87. The court noted that the agents were without handcuffs and had no way to neutralize the suspects until they finished their search. *Id.* at 87. It further noted the high likelihood that a woman would keep a weapon in a handbag. *Id.* The court also rejected the argument that the passage of time undermined the reasonableness of the search. Some of its reasoning bears on the facts of this case as well:

> It would have been unwise for the agents who lacked handcuffs and had other work to do simply to have handed Fantauzzi her bag and released her or to have left the bag unsearched. So long as the purse remained unopened, it was a source of danger to the agents and to the suspects as well, whose innocent or unintended gesture in the direction of the bag might have resulted in calamitous consequences. We need not wait for such a tragedy to occur to appreciate the unrealistic nature

---

4. Similarly, the government's reliance on *United States v. Berryhill,* 445 F.2d 1189 (9th Cir. 1971), is misplaced. Although the court there discussed *Terry* and its progeny, it clearly relied on search incident to arrest and standing as the grounds for upholding the legality of the search at issue. 445 F.2d at 1193–94.

of Fantauzzi's argument. The rule of minimal intrusion permits whatever efforts are necessary to neutralize a potentially explosive and fatal situation. The steps taken here were well within the permissible range.

*Id.* at 87.

The justification for a *Terry* search "is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. at 1884. The search must entail the minimal degree of intrusion appropriate to the particular circumstances. *U. S. v. Barlin,* at 86; *cf. United States v. Vasquez,* 638 F.2d 507, 508, 520 (2d Cir. 1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981) (stating that "[i]n general, if probable cause is lacking, the intrusion must be no greater than the circumstances require"). "It is reasonable to conclude that such an intrusion, in addition to a frisk of the person, would ordinarily include 'the area "within his immediate control" '—construing that phrase to mean the area from within which [the person being searched] might gain possession of a weapon . . ." *United States v. Johnson,* 637 F.2d at 535 (8th Cir. 1980) (quoting from *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), as quoted in *United States v. Chadwick,* 433 U.S. 1, 14, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977), and finding the analogy to search incident to arrest "appropriate"). In determining whether a particular stop and search is valid, a court must view the surrounding circumstances "as a whole, not as discrete and separate facts" and "through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States v. Barlin,* at 86. (relying upon and quoting from *United States v. Delos-Rios,* 642 F.2d at 45).

Applying these principles to the facts at hand, and mindful of the manner in which they have been applied by higher courts in similar circumstances, I conclude that Agent Moser's curbside search of the defendant's bag was lawful. I base this conclusion on the likelihood that the bag contained a weapon, the nature of the threat that such a weapon posed to agents Moser and Coleman, and the limited nature of the search conducted by Agent Moser. Agent Moser's conduct must be measured against a background that includes "the violent nature of narcotics crime." *United States v. Barlin,* at 86 (quoting from *United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir. 1980)). Certain factors, not previously mentioned, supported the likelihood that any weapon was in the bag and the reasonableness at a protective search. First, the stop occurred during the summer. Because people are lightly clothed in warm weather, there is less opportunity to hide a weapon on one's person. Second, the size and shape of the bag was functionally similar to a handbag, which has been recognized as a likely repository for a weapon. *United States v. Barlin,* at 87; *United States v. Vigo,* 487 F.2d at 298. The bag was cylindrical in shape, about 24 inches long and perhaps ten to twelve inches in diameter. A zipper ran along the length of it, permitting easy access to the contents. It was not a large suitcase in which it might be difficult to locate a particular article or which might have multiple fasteners requiring substantial time to unfasten. The defendant was carrying the bag on his shoulder with his arm placed through the straps at the top of the bag. The bag's contents were as accessible as that of a handbag. *See* T. 40–41, 90–91 (demonstration conducted at hearing).

At the time of the initial stop, the defendant certainly had easy access to any weapon inside the duffle bag. Defendant contends, however, that once he removed the bag from his shoulder, placed it on the ground and moved away from it, any threat that the bag posed to the officers was dissipated. Though the danger was reduced after the defendant relinquished possession of the bag, it was not eliminated. As already noted, little time would be required for any of the three men to reach the bag.

**224**

Thus, like the purse in *Barlin,* so long as the bag remained unopened, "it was a source of danger to the agents and to the suspects as well, whose innocent or unintended gesture in the direction of the bag might have resulted in calamitous consequences." at 87.

At the time of the search of the bag, Agent Moser did not intend to arrest the defendant. Presumably, he would have had to return the bag if subsequent events had not furnished probable cause to arrest. Although the defendant's motive for using a weapon after the questioning would have been reduced, the possibility that he would do so would have remained. The agents would still have had Vergara, the defendant's suspected cohort, in the back seat of their car. The defendant would have been aware of police interest in his activities. Agent Moser could not be sure that the defendant or another man would not react violently. Although certain alternative prophylactic measures, such as directing the suspects not to approach the bag until after their car had left the scene, were available to the agents, such steps would have been less effective than a search and would not have eliminated the problem during or after the questioning.

Finally, Agent Moser's curbside search was limited in scope. It was not a general exploratory search for whatever evidence of criminal activity he might find. *See United States v. Johnson,* 637 F.2d at 535; *United States v. Poms,* 484 F.2d at 922. The agent hurriedly picked his way through the contents of the bag. The bag was small and did not require extensive rummaging in order to determine if it contained a weapon. The agent worked his way to the bottom of the bag because he had felt a hard object at the bottom. The search only lasted a few seconds. Agent Moser did not open the closed thermoses containing the cocaine at this time; he did not empty the contents of the bag onto the street; he did not look for false compartments; he did not inventory the contents. He merely picked among the

objects in the bag to determine whether a weapon was among them. The search therefore seems to have been sufficiently limited in intrusiveness to fall within the scopes of *Terry.*

When Agent Moser legitimately looked inside the bag for a weapon, the white powder and other objects that supplied probable cause to arrest were in plain view. *See United States v. Poms,* 484 F.2d at 922. *See generally Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The white powder, the scale, and other drug paraphernalia seen in the bag, together with the facts previously mentioned, provided probable cause to arrest the defendant.

■ The subsequent warrantless search of the duffle bag at headquarters was also lawful. It was a search incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). There is no question that the bag was seized at the time of arrest.[5] Under the circumstances, the fact that the search was delayed until the agents returned to headquarters does not render it unlawful. *See United States v. Lam Muk Chiu,* 522 F.2d 330, 332 (2d Cir. 1975); *United States ex rel. Muhammad v. Mancusi,* 432 F.2d 1046, 1047 (2d Cir. 1970), *cert. denied,* 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971); *United States v. Frankenberry,* 387 F.2d 337, 339 (2d Cir. 1967) (decided before *Chimel*); *United States v. Venizelos,* 495 F.Supp. 1277, 1279–80 (S.D.N.Y.1980) (Weinfeld, J.); *see also United States v. DeLeo,* 422 F.2d 487, 491–93 (1st Cir.), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *cf. Abel v. United States,* 362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960) (when accused chooses to take with him property subject to lawful search at place of arrest, property is subject to search at first place of detention when the accused arrives there).

In this case, not only was the bag seized pursuant to an arrest, it had already been

---

5. Likewise, the duffle bag, as described *infra* p. 223, was not "luggage or other personal property not immediately associated with the person of the arrestee," *United States v. Chad-* *wick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977), thus distinguishing *Chadwick. See also New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768.

opened and subjected to two limited searches at the place of arrest. As Judge Friendly has remarked in similar circumstances, "[i]t would outrage common sense and human nature to read the Fourth Amendment to require that after having lawfully opened the briefcase and inspected [the incriminating evidence], . . . the police should be required to interrupt their work and apply for a warrant before going further . . . ." *United States v. Ochs,* 595 F.2d 1247, 1259 (2d Cir.) *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979), *See also United States ex rel. Muhammad v. Mancusi,* 543 F.2d at 1047 to the effect that the search, as conducted, was more "reasonable" and less humiliating, as well as safer for the agents, than to have conducted a complete search on the street. *See United States v. Venizelos,* 495 F.Supp. at 1280.[6]

Defendant's motion to suppress the evidence found in the course of the curbside search and the subsequent headquarters search of the duffle bag is accordingly denied.

SO ORDERED.

---

**6.** Because I conclude that the headquarters search was lawful as a search incident to arrest, I do not consider whether it was also lawful as an inventory search. *See United*

*States v. Markland,* 635 F.2d 174 (2d Cir. 1980), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981).