**UNITED STATES of America,**

v.

**Edilma PEREZ, a/k/a "Mima", Virginia Moran, Martha Guzman, Leocadio Caro, Hernando Caro, Luis Torres, a/k/a "Gustavo Vera", Defendants.**

Nos. CR 83–00248, CR 83–00334.

United States District Court,
E.D. New York.

Oct. 11, 1983.

As Modified Nov. 7, 1983.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., by Carol B. Schachner, Asst. U.S. Atty., New York City, for U.S.

Federal Defender Services Unit (E.D. N.Y.) Legal Aid Society by Marion Seltzer, Brooklyn, N.Y., for Edilma Perez.

Jeffrey Lewisohn, New York City, for Virginia Moran.

Philip Katowitz, Brooklyn, N.Y., for Martha Guzman.

Bert H. Nisonoff, Forest Hills, N.Y., for Leocadio Caro.

Steven H. Mosenson, Baden, Kramer & Huffman, New York City, for Hernando Caro.

Lawrence M. Herrman, Richard A. Greenberg, Coblence & Warner, New York City, for Luis Torres.

## MEMORANDUM & ORDER

PLATT, District Judge.

Defendants in this case are charged with possession of cocaine with intent to distribute, and conspiracy, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). They have each moved to suppress certain evidence and to dismiss the indictment. This Court held hearings on July 14, 27 and 28, 1983 to consider this motion. In addition, the government has moved this Court to consolidate for trial the indictment against defendants Mmes. Moran and Guzman, and Messrs. Leocadio Caro and Torres with the indictment against Hernando Caro. For the reasons set forth below, the various motions of defendants are denied, and the government's motion to consolidate is granted.

## THE FACTS

On May 23, 1983, acting through a confidential informant, members of Group IV of the New York Drug Enforcement Task

Force arranged to purchase one-eighth of a kilogram of cocaine from the informant's "source of supply." (July 14, Tr. 24) This source was described as a female Hispanic named "Mima." [1] Ms. Perez agreed to deliver the cocaine to the informant that night at a location in Manhattan. When she did not appear as scheduled, the informant called Ms. Perez and was informed that her connection had not responded to a call to his beeper number, and a new meeting was scheduled for the next evening. (July 14, Tr. 27–28)

At that time Police surveillance was established at both the Manhattan meeting place and Ms. Perez's suspected residence at 92–16 Whitney Avenue in Queens. The police observed Ms. Perez leave the latter residence shortly before the rendezvous time, and radioed to the Manhattan police the license number and make of Ms. Perez's car. Approximately 40 minutes later this car was observed approaching the rendezvous site, where it stopped to let Ms. Perez out, and then drove off. (July 14, Tr. 28–32)

Ms. Perez met with the informant, but the transaction was not consummated, and she left the scene by taxi, followed by the police. When it appeared that Ms. Perez suspected she was being followed, the police stopped the taxi and arrested her. On her person was one-eighth of a kilogram of 90% pure cocaine and $2,551.00 in cash. (July 14, Tr. 32–36)

Ms. Perez was advised of her *Miranda* rights in Spanish, which she indicated she understood. She then gave her consent for the police to search her apartment in Queens. (July 14, Tr. 36–38)

Thereafter in their car the police drove with Ms. Perez to her apartment where they met with the superintendent. He recognized Ms. Perez as a tenant in apartment # 110, which, he said, was also occupied by at least one other female resident. Because Ms. Perez did not have keys to the apartment, the police asked the superin-

tendent to knock on the door thereof, and he did so. A woman's voice was heard inside and the door opened. At this time the detective involved stepped in front of the door and announced that it was the police. The woman (subsequently identified as defendant Moran) attempted to slam the door, but the detective kept it open with his shoulder, and the police entered the apartment. (July 14, Tr. 38–42)

Upon entering, the police first saw a triple-beam O'Haus scale, which the detective testified is a common fixture in apartments where drugs are packaged. They then saw defendant Guzman in the apartment hallway and proceeded to check the rest of the apartment to see if any other people were present. In the master bedroom the detectives saw a dinner plate on a pillow on the bed, upon which was a small mound of white powder (later identified as cocaine) and above which was a high intensity light. (July 14, Tr. 42–46)

At this point defendants Guzman and Moran were placed under arrest and informed of their rights, which they indicated they understood. The officers also now obtained Ms. Perez's written consent to search her apartment. (July 14, Tr. 48–49) The evidence shows, and defendants do not dispute, that this consent was given freely and knowingly.

A more thorough search of the apartment followed immediately. The long closet in the small bedroom yielded a white purse containing $1,585.00 in cash. The purse was initially claimed by defendant Moran (July 28, Tr. 97), but the money inside was later claimed by defendant Guzman. (July 14, Tr. 53) Outside the small closet in the small bedroom the officers found a brown plastic bag which contained plastic bags of white powder, later identified as cocaine, and $1,203.00 in cash. In addition, the small bedroom yielded a purse, in which the officers found a Colombian passport bearing the name Marida

---

1. "Mima" was subsequently identified as Edilma Perez, who was named a defendant in the original indictment. Ms. Perez pleaded guilty on July 15, 1983 to both counts of the indictment, and was sentenced by this Court on September 2, 1983. All future references to this defendant will be as "Ms. Perez."

Restrepo de Velez, which contained a photograph of defendant Moran and a Colombian passport bearing the name Virginia del Carmen Moran de Guzman, which also contained a photograph of defendant Moran. Also found was a yellow cannister containing $2,084.00. (July 27, Tr. 5–7).

A search of the kitchen turned up a large quantity of small clear plastic bags (July 27, Tr. 29).

The officers then asked defendant Guzman where she slept in the apartment, to which she first replied that she slept in the small bedroom. She then changed her answer and said that she slept on the couch in the living room. (July 27, Tr. 8).

In the large bedroom, which Ms. Perez indicated she used, were found various papers with the name Edilma Perez and Maria Perez. Also found was a list of phone numbers, one of which was 218–3282. (July 27, Tr. 28).

Approximately 40 minutes into the search of apartment 110, the buzzer from the outside door rang. The police pushed the button opening the front door and a moment later there was a knock on the door. The police opened the door and saw defendants Leocadio Caro and Hernando Caro [2] standing together in the hallway. The detective said "Police, come on in," and Mr. Hernando Caro walked into the apartment, carrying a leather bag. Mr. Leocadio Caro took a half step to his left, dropped a brown leather bag in the hallway and entered the apartment. (July 27, Tr. 9–10).

The detective immediately retrieved the dropped bag, opened it, and saw three clear plastic bags containing white powder, later identified as 380 grams of approximately 85% pure cocaine. (July 27, Tr. 13–14).

At this time both Messrs. Caro were placed under arrest, and the bag Hernando Caro was carrying was taken from him by the officers. Both Caro defendants were then handcuffed and read their rights in

Spanish, which they indicated they understood. (July 28, Tr. 189–190).

Mr. Hernando Caro's bag was opened and searched. Inside were found certain papers and documents which the government alleges are drug trafficking records. (July 27, Tr. 15–17). Mr. Hernando Caro was asked by Detective Martinez of the New York City Police Department how he and Mr. Leocadio Caro had travelled to the apartment that night, and he answered "by car", and described a white station wagon. When asked where the keys were, Mr. Leocadio Caro produced a set of keys which fit a white station wagon parked at a fire hydrant outside Ms. Perez's apartment. (July 28, Tr. 191).

Forty minutes after the arrival of the Caro defendants the front door buzzer rang again. The buzzer was pushed again and, moments later, there was another knock on the door. Detective Prakin of the New York City Police Department opened the door, saw defendant Luis Torres and recognized him as the person upon whom he had served a state arrest warrant for firearms possession while Mr. Torres was in the Federal Metropolitan Correctional Center. Detective Prakin also knew that Mr. Torres was a Colombian citizen who had been convicted of a federal narcotics violation, and he therefore believed that Mr. Torres was present in this country illegally. Considering Torres to be under arrest at that moment, the detective pulled Torres into the apartment by the arm, looked out into the hall for other visitors, and then shut the door. (July 27, Tr. 17–19)

At this time Detective Prakin noticed a bulge under Mr. Torres jacket. Mr. Prakin unzipped the jacket, reached in and removed a soft brown paper bag. Opening the paper bag he found a plastic bag containing white powder, later identified as 61 grams of 82% pure cocaine. Mr. Torres was then placed under formal arrest, and advised of his rights in Spanish, which he

---

**2.** Although they have the same surname, defendants Hernando Caro and Leocadio Caro assert that they are not related.

indicated he understood. Also taken from Mr. Torres' person was a beeper attached to his waist, call number 218–3282, and a set of car keys. (July 27, Tr. 21–25).

The police then searched Mr. Torres' car, which was parked outside, and discovered $4,000 in cash wrapped in a paper towel under the driver's seat. (July 27, Tr. 25–26).

After all such searches were completed the defendants were taken to Drug Enforcement Headquarters in Manhattan, where they were interviewed. Defendants Perez, Moran and Guzman all gave the same address and phone number, i.e., the apartment in which the arrests took place. Mr. Hernando Caro first gave a street address in Miami, Florida. He also gave as his address a rooming house in Elizabeth, New Jersey, and a traffic summons indicated an address in Long Island City. Detective Prakin was able to verify that Mr. Hernando Caro lived at the New Jersey address. (July 27, Tr. 35–38).

Mr. Leocadio Caro gave as his address another rooming house in Elizabeth, New Jersey. However, no one at that address had ever seen anyone resembling Mr. Leocadio Caro before. While questioning the owner of Mr. Hernando Caro's rooming house, the officers learned that Mr. Leocadio Caro lived there also and that Messrs. Hernando and Leocadio Caro were friends. (July 27, Tr. 38–39).

## DISCUSSION

Each defendant has moved to dismiss the indictment and to suppress any evidence pertaining to him or her. The Court will discuss each defendant in turn.

### I

■ Defendant Virginia Moran challenges the admission against her of any tangible evidence seized either from apartment 110, or from any of her alleged co-conspirators. Although Ms. Moran argues in a vague way that the policy of police deterrence behind the Fourth Amendment gives her standing to challenge alleged violations of the rights of others, this Court need not reach these questions because of our disposition of the challenges of Ms. Moran's co-conspirators; but if our conclusion in this respect is incorrect, nonetheless there is no merit to her contentions. Because Ms. Moran raises no question about any item seized from her person at the time of arrest, her motion to suppress must therefore be denied.

■ Ms. Moran also moves that the government's indictment be dismissed as to her. Moran argues that she was "merely present" at the time of the arrest of her co-defendants on May 24, 1983, and "did not participate in any way with any alleged sale(s), possession or distribution" of cocaine. If the extent of the government's proof was only that Ms. Moran was present in the apartment at the time of arrest, we might be compelled to rule in her favor, *see United States v. Soto*, 716 F.2d 989 (2d Cir.1983). However, the government has offered proof that Ms. Moran resided in Perez's apartment, that there were two Colombian passports with her picture in them in the small bedroom of that apartment, which she allegedly occupied; that she slammed the door on the police and that also in the small bedroom were her purse with a large amount of currency, as well as over half a kilogram of over 50% pure cocaine.

Given this evidence, as well as the evidence of narcotics processing and distribution equipment in the common areas of the apartment (the scale and plastic bags in the kitchen) we think there is sufficient evidence against defendant Moran for the indictment to stand.

### II

Defendant Guzman has filed no papers with the Court, but joins generally in the motions to dismiss the indictment and suppress the evidence seized from apartment 110.

■ As discussed above in connection with defendant Moran, we feel that Ms. Guzman was more than merely present in apartment 110. There is evidence that the room where she at least occasionally slept

had in it a bag with packages of cocaine, as well as substantial amounts of currency. In addition, she claimed ownership of some of the cash seized from that bedroom. (July 14, Tr. 53; July 28, Tr. 97). In light of the drug traffic apparently being carried on around her, this Court finds that there was sufficient evidence to indict her. *United States v. Soto, supra,* is inapposite. There defendant's conviction was reversed because the evidence only showed that defendant lived in an apartment where narcotics were being distributed. Here, however, the government has offered additional proof to the effect that the defendant Guzman claimed some of the currency alleged to have been involved in the conspiracy. We find that this additional evidence is enough to allow the indictment against Ms. Guzman to stand.

■ Guzman seeks to suppress certain cash found in a purse in the small bedroom of apartment 110. It appears from the record that the purse from which the cash was seized belonged to defendant Moran, and that Guzman could not have had a reasonable expectation of privacy in Moran's purse. Thus Guzman lacks standing to challenge the introduction of the cash as evidence. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Moreover, since closed containers found during a lawful search do not require a separate warrant, *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Terry,* 702 F.2d 299, 309 n. 9 (2d Cir.), *cert. denied sub nom Williams v. United States,* — U.S. ——, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), Perez's consent to the search vitiated any requirement that a purse left in a closet in a bedroom be named in a search warrant before being opened. *United States v. Buettner-Janusch,* 646 F.2d 759, 764 (2d Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981).

### III

■ Defendant Leocadio Caro raises four issues. The first is whether Detective Prakin had probable cause to arrest him when he first entered apartment 110. Mr. Leocadio Caro seems to argue that he was under arrest as soon as the door to apartment 110 was opened and that his mere presence at the apartment where drugs were found was not enough to give rise to probable cause to arrest him. If said defendant's characterization and description of his arrest were correct, we might have more trouble with this part of his motion. However, it is clear from the record that when Mr. Leocadio Caro first entered apartment 110, it was in response to a mere invitation to "come on in." Moreover, it was only after Detective Prakin had discovered the cocaine in said defendant's abandoned bag that he was placed under arrest. Although he is free to argue to a jury that the bag first seen in his possession and moments later (after his arm disappeared from view) found on the hallway floor was not in fact his bag, we think that there was probable cause to arrest him when the contents of the bag were discovered.

■ Mr. Leocadio Caro next argues that the contents of the bag should be suppressed because he never abandoned the bag in question. Although he suggests that "dropsy" abandonment cases must be scrutinized with care, this Court is satisfied that the bag retrieved from the hallway and searched by Detective Prakin had indeed been abandoned by the defendant. The evidence shows that when he discovered that apartment 110 was being searched by police, he stepped to his left and dropped the bag which he had been carrying as he approached the door. No matter what the impetus for such abandonment, the defendant clearly gave up any expectation of privacy in the bag so discarded. Thus Detective Prakin's retrieval and search of the bag did not offend any Fourth Amendment rights of this defendant. *Rawlings v. Kentucky, supra; United States v. Kramer,* 711 F.2d 789, 792 (7th Cir.1983); *United States v. Terry, supra; United States v. Alden,* 576 F.2d 772, 777 (8th Cir.1978).

■ Mr. Leocadio Caro also challenges the fact that his car keys were obtained from him. Here there is a dispute of fact. Detective Martinez testified that Mr. Leo-

cadio Caro voluntarily produced the set of car keys in response to a question by him along the lines of "where are the keys to the car?". (July 28, Tr. 191). However, Detective Prakin indicated that Mr. Leocadio Caro was handcuffed when he was placed under arrest. (July 28, Tr. 130). The defendant argues that if he were indeed handcuffed then Detective Martinez unlawfully searched his person and seized the car keys. However, in light of our earlier conclusion that Mr. Leocadio Caro was lawfully placed under arrest, we need not reach the question of whether he voluntarily offered up the keys to the detective, or whether he was searched, since any warrantless search of his person was within the exception to the warrant requirement of the Fourth Amendment outlined in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ Mr. Leocadio Caro argues further that the warrantless search of his car was in violation of the Fourth Amendment and that evidence obtained therein should be suppressed. However, once probable cause for arresting him for a narcotics violation was established, there was also probable cause to believe that his car was seizable under 21 U.S.C. § 881(a)(4) (1976). *United States v. Pappas*, 613 F.2d 324 (1st Cir. 1979). It is the law of this Circuit that a car seizable under § 881(a)(4) may be searched without a warrant. *United States v. Modica*, 663 F.2d 1173, 1177 (2d Cir.1981) (per curiam), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. One 1974 Cadillac Eldorado Sedan, Serial No. 6L47S4Q407966*, 548 F.2d 421 (2d Cir.1977).

### IV

Defendant Hernando Caro has moved to suppress certain evidence seized from him on the ground that there was no probable cause to arrest him, and therefore the war-

rantless search of his bag was illegal.[3] In the alternative, he argues that if the search was incident to a *Terry* stop,[4] Detective Prakin should have known that there was no weapon in Hernando's bag, and that his subsequent opening of the bag went beyond the permissible limits of *Terry*.

■ Although this defendant attempts to distinguish it, we think the Second Circuit's recent opinion in *United States v. Barlin*, 686 F.2d 81 (2d Cir.1982) controls this case. There agents of the Drug Enforcement Agency were searching an apartment which was a known narcotics trafficking area when three persons arrived. The agents had a warrant to arrest one of the newcomers, who they knew to be involved in drug trafficking, and detained and searched the other two. Although in *Barlin* the agents were without handcuffs and had already found weapons in the apartment, we think that "against a background that comported with 'the violent nature of narcotics crime' *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980)" *Barlin, supra* at 87, the actions of the police in detaining and searching this defendant were reasonable. The police in this case were inside an apartment where narcotics trafficking was obviously being carried on; their presence was not known to anyone who might be arriving to transact business; the agents knew that at least one courier with a beeper was at large; and when the abandoned bag of Mr. Leocadio Caro was searched, three packages of cocaine were found. Under these circumstances, we agree with the Second Circuit's discussion in *Barlin*:

Although Fantauzzi was unknown to the agents, we think her detention, the initial search of her person and the search of her pocketbook were reasonable and minimally intrusive. Unlike *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct.

---

**3.** Mr. Hernando Caro was originally indicted with the other 5 defendants on June 2, 1983. On July 28, 1983 this Court dismissed this original indictment as against him, on the understanding that he would be re-indicted shortly thereafter. On the next day a new indictment was filed against the defendant, arising out of

the same transaction as is described herein. The government has moved to consolidate the two indictments for trial, a notion we discuss later in this memorandum.

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

338, 62 L.Ed.2d 238 (1979), Fantauzzi was not innocuously present in a crowd at a public place. Instead, she entered in tandem with Frank and Gleckler, whose involvement in an ongoing narcotics transaction seemed apparent. The agents did not have a realistic option of separating her from the others. *Compare United States v. Clay*, 640 F.2d 157 (8th Cir.1981); *cf. United States v. Ceballos*, 654 F.2d 177 (2d Cir.1981). Without handcuffs, they had to neutralize the suspects and finish the search. Search of Fantauzzi's purse was hardly gratuitous in these circumstances, since "a lady's handbag is the most likely place for a woman to conceal a weapon." *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir.1973).

686 F.2d at 87.

■ Further and in particular Detective Prakin testified that when he grabbed Hernando Caro's bag he felt what he suspected was a handgun (July 28, Tr. 131). Thus he was entitled to search the bag for weapons, *United States v. Morales*, 549 F.Supp. 217 (S.D.N.Y.1982) (search of duffel permissible even though defendant had put it on the ground and moved two feet away). *See also United States v. McClinnhan*, 660 F.2d 500 (D.C.Cir.1981); *United States v. Mason*, 450 A.2d 464 (D.C.1982). Once entitled to search the bag, contraband which was easily recognized and in plain view could be seized, and could form the basis of a lawful arrest. *Texas v. Brown*, — U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Ochs*, 595 F.2d 1247, 1257–58 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

This defendant also seeks to suppress any evidence seized from the white station wagon in which he and Mr. Leocadio Caro drove to the scene of the arrest. However,

as discussed, *supra*, the police had probable cause to believe that this car was subject to forfeiture under 21 U.S.C. § 881(a)(4), and thus the warrantless search of that car was permissible. *United States v. Modica, supra*.

## V

Defendant Luis Torres has moved to suppress a quantity of cocaine and a beeper seized from his person, $4,000.00 in cash seized from his car, and an oral statement.

■ When the door of apartment 110 was opened in response to Mr. Torres' knock, Detective Prakin recognized him as a narcotics and firearm law violator and he had reasonable grounds to believe that Mr. Torres was in this country illegally. With knowledge that a courier with a beeper was involved in Ms. Perez's drug distribution network, the detective noticed a bulge under Mr. Torres' jacket. We think that under these circumstances probable cause existed to believe that this defendant was a member of the assembling conspiratorial group and therefore to arrest him at this time,[5] *United States v. Ocampo*, 650 F.2d 421, 426 (2d Cir.1981); *United States v. Morales, supra*, and thus the seizure and search of the paper bag was lawful, despite the fact that Mr. Torres was not formally placed under arrest until after the cocaine was found on his person. *Rawlings v. Kentucky*, 448 U.S. at 111, 100 S.Ct. at 2564, 65 L.Ed.2d at 645–46 (1980); *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *United States v. Riggs*, 474 F.2d 699, 704 (2d Cir.), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973).

Mr. Torres suggests that the government's distinction between worthy and unworthy containers cannot survive the Supreme Court's decision in *United States v. Ross, supra*. However, we do not rest our

---

5. In percentage terms, the degree of the evidence required to sustain a finding of "probable cause" has been variously estimated to be anywhere from 25% to 40%. The government, of course, did not call a statistician to give an expert opinion as to the odds with respect to the proposition that Mr. Torres was an innocent visitor paying a purely social call given such facts and all the other facts and circumstances theretofore uncovered that evening. Nonetheless, it is safe to say that the chances of such being the case here were far less than "fifty-fifty."

decision on such a distinction. Rather, we feel that *Ross* stands for the proposition that a warrantless search which is covered by a valid exception to the warrant requirement of the Fourth Amendment may be as broad as a magistrate could have ordered in a warrant. *Ross* 456 U.S. at 824, 102 S.Ct. at 2172, 72 L.Ed.2d at 593; *United States v. Terry, supra,* at 309 n. 9. *See also United States v. Fleming,* 677 F.2d 602, 608 (7th Cir.1982). Thus, under *Ross,* the nature of Mr. Torres' bag is not a decisive factor once there is probable cause for his arrest.[6]

Under the above reasoning, the beeper taken from Mr. Torres' belt is also admissible and will not be suppressed.

 Mr. Torres also seeks to suppress $4,000.00 in cash found under the front seat of his car. As discussed in reference to the Messrs. Caro, *supra,* probable cause existed to believe that Mr. Torres' vehicle was subject to forfeiture under 18 U.S.C. § 881(a)(4), and thus the search which turned up the cash did not need to be supported by a warrant. *Modica, supra.*

 Mr. Torres also seeks to suppress an oral statement he made either at his entry to the apartment (July 28, Tr. 165) or at Police Headquarters (July 28, Tr. 222), that he was "Puerto Rican." It is unclear from the record whether Mr. Torres had been told his rights before he stated to Detective Prakin that he was Puerto Rican. However, it is clear that he had been given the *Miranda* warnings before he told Detective Martinez at Drug Enforcement Headquarters that he was Puerto Rican. Since he had been given the *Miranda* warnings before the second statement, and since Mr. Torres does not allege that there was any compulsion of any kind exerted on him, we feel that the remark need not be suppressed.

**6.** Although we find that there was probable cause to arrest Mr. Torres when he arrived at apartment 110, it is clear to us that a search of Mr. Torres' jacket and the parcel it concealed would have been a reasonable search pursuant to a *Terry* stop: the police were inside an apartment known to be the site of narcotics traffic, and Mr. Torres was recognized as a narcotics and firearms violator. Considering "the violent nature of narcotics crime", *Vasquez, supra,* at

## VI

Finally, the government has moved to consolidate for trial the separate indictment of Mr. Hernando Caro with the main indictment against defendants Moran, Guzman, Leocadio Caro and Torres. As noted earlier, all 5 defendants were originally indicted together, but Mr. Hernando Caro's motion to dismiss the original indictment as to him was granted, with the understanding that he would be re-indicted immediately thereafter (July 28, Tr. 258–59). (During this short interim period defendant was held under a complaint filed with the Magistrate.)

Rule 13 of the Federal Rules of Criminal Procedure provides that a court may order that two or more indictments be tried together if the offenses and the defendants could have been joined in a single indictment. Rule 8(b) provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same transaction constituting an offense. Rule 14 provides that a court may sever or grant other relief if it appears that a defendant would be prejudiced by joinder.

The indictments sought to be joined here both arose out of the same transaction, and the evidence to be introduced at trial will likely be the same for each. Clearly a joint trial would serve the interests of judicial economy.

The granting or refusal of a severance is within the broad discretion of the trial court, *United States v. Carson,* 702 F.2d 351, 366 (2d Cir.), *cert. denied sub nom. Mont v. United States,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1983).[7] The stan-

43, we think that the officers had "no suitable or safe alternative to a warrantless search" of Torres parcel, *McClinnhan, supra,* at 504. *See also Barlin, supra; Mason, supra.*

**7.** The cited cases are couched in terms of a denial of a defendant's motion to sever, rather than the granting of the government's motion to join. Once the government has shown that the ends of judicial economy are to be served by

dard for exercising our discretion seems to us to be whether or not the defendant or defendants will suffer substantial prejudice due to joint trial. *Carson, supra,* at 366.

Defendant Leocadio Caro argues that he will be prejudiced by the introduction at trial of the statement by Mr. Hernando Caro that "we came here in a white station wagon." Mr. Leocadio Caro argues that admission of this statement will cause a problem under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since Mr. Leocadio Caro would not be able to cross-examine a non-testifying Mr. Hernando Caro.

■ Under *United States v. Wingate,* 520 F.2d 309 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), a *Bruton* problem only requires severance when the statement offered is both clearly inculpatory to the defendant *and* vitally important to the government's case against the defendant. *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.) *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). In light of the fact that cocaine was discovered in Mr. Leocadio Caro's bag before Mr. Hernando Caro's allegedly inculpatory statement, we think that the statement is not vitally important to the government's case, and that Mr. Leocadio Caro has not demonstrated substantial prejudice by joinder.

Mr. Hernando Caro asserts that he will be prejudiced by the fact that of all the defendants, only he is a legal alien.[8] Mr. Hernando Caro also alleges that there is likelihood that a jury will confuse Mr. Hernando Caro with defendant Mr. Leocadio Caro because they share a surname. Finally Mr. Hernando Caro argues that he is the only defendant not in actual or constructive possession of cocaine.

We feel confident that a jury will be able to weigh the evidence against each of the Messrs. Caro individually, despite the similarity of their last names. Moreover, Mr. Hernando Caro's purse contained what are

allegedly drug records, and thus his guilt would not only be by association.

We fail to find any substantial prejudice to any of the defendants by a joinder for trial of these two indictments.

## CONCLUSION

For the reasons above stated, defendants' motions to dismiss the indictments and to suppress certain evidence are denied. The government's motion to consolidate the indictments for trial is granted.

SO ORDERED.

---

joinder, we do not think that the considerations in the two situations are different.

**8.** The government has stated in its brief that it does not intend to introduce at trial evidence of the illegal status of any of the defendants.