**UNITED STATES of America,**

v.

**Evelio MARTINEZ, Carmen Rodriguez, and Ramon Alfonso, Defendants.**

**No. 85 Cr. 932 (DNE).**

United States District Court, S.D. New York.

April 23, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (David Brodsky, Henry Pitman, Asst. U.S. Attys., New York City, of counsel), for plaintiff.

Labush, Levy, Gotlin, Jaffe & Walker, New York City (Gerald M. LaBush, Jr., of counsel), for defendant Evelio Martinez.

Norman Corenthal, New York City, for defendant Carmen Rodriguez.

The Legal Aid Society, New York City (Caesar D. Cirigliano, Ruth M. Chamberlin, of counsel), for defendant Ramon Alfonso.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Defendants Evelio Martinez ("Martinez"), Carmen Rodriguez ("Rodriguez"), and Ramon Alfonso ("Alfonso") are charged in a superceding indictment with conspiring to violate the federal narcotics laws in violation of 21 U.S.C. § 846. In addition, Martinez and Rodriguez are charged with possessing with intent to dis-

tribute approximately 998 grams of cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2. Defendants have filed pretrial motions. The motions are denied.

## BACKGROUND[1]

In September 1985, an individual named Richard Kennedy ("Kennedy") asked a government informant ("Informant") to participate in a burglary of Rafael Hernandez ("Hernandez"), an alleged cocaine dealer. Kennedy also told the Informant that two other individuals, Toto Vargas ("Vargas") and his son Frank, would assist in the burglary. Kennedy further told the Informant that Hernandez possessed ten kilograms of cocaine, and large amounts of cash and jewelry.

On September 22, 1985, Kennedy, Vargas, Frank, and the Informant met together to attempt to commit the burglary. Armed with several firearms, they went to 612 West 178th Street, New York, New York, where, according to Vargas, Hernandez kept his cocaine, cash, and jewelry. Vargas said that these items were hidden in a closet behind a false wall. When the four men arrived at 612 West 178th Street, the Informant was sent to apartment 24 to see if anyone was home. Con Edison records indicated that the utilities for this apartment were registered to Hernandez. After learning that Hernandez was not at home, the burglars postponed the burglary until the next day. The following day, the burglary was again postponed because Kennedy had been arrested in Nassau County on unrelated charges.

Four days later, on September 27, 1985, Vargas told the Informant that the burglary would go forward that night with Joseph Raso ("Raso") replacing Kennedy. Vargas further stated that he had spoken with Hernandez's girlfriend, Marie Jackson, a/k/a Inez ("Inez"), the night before. She informed Vargas that ten kilograms of

cocaine and $100,000 in cash were still in Hernandez's apartment, but that Hernandez was planning to take the cash to Miami the next day. Vargas also told the Informant that he had previously seen Hernandez wearing large amounts of expensive jewelry, and had previously heard him boasting about keeping money and drugs in his apartment. Later that evening, Vargas, Frank, Raso, and the Informant met together and headed for Hernandez's apartment. Having been advised by the Informant of the burglary plans, the Government intercepted and arrested the would-be burglars en route to Hernandez's apartment.

The arresting officers seized from the burglars' car many items including a gun, two sets of handcuffs, several lengths of rope, and two phoney New York Police Department shields. The burglars had planned to flash these shields in order to gain entry into the apartment. After being advised of his constitutional rights, Vargas admitted that he and his associates were on their way to Hernandez's apartment to steal cocaine, cash and jewelry. Vargas stated that he had learned about the valuables from Inez. Vargas further stated that Inez had told him that she frequently visited Hernandez's apartment, and that she had often seen large amounts of cocaine and cash there, most recently within the past few days.

Based on the above facts, the government sought and obtained a search warrant for Hernandez's apartment from Magistrate Sharon Grubin. Because the Informant had been told that Hernandez was taking a large amount of cash to Miami the following day, a search warrant upon oral testimony was obtained pursuant to Rule 41(c)(2) of the Federal Rules of Criminal Procedure. The search revealed over one kilogram of cocaine, scales, strainers and cocaine diluents. This contraband was seized from a closet that also contained

---

1. The government is the only party that has presented sworn statements setting forth the facts of this case. These facts were presented to the court in the form of sworn affidavits for

search and arrest warrants and testimony from Detective Rocco Sanfilippo of the New York Drug Enforcement Task Force.

defendant Rodriguez's clothes. Several .38 caliber bullets were recovered from her purse. A Cuban passport, belonging to defendant Martinez along with several pictures of Martinez were also recovered from the apartment. In addition, seized from a closet was an attache case that contained a checkbook belonging to Martinez, papers documenting Martinez's ownership of three automobiles, including two cadillacs, and a key to safe deposit box number 5043, located at Citibank, 181st Street and Broadway, New York, New York. A loaded .38 caliber pistol was found next to the attache case.

At the time of the search, defendant Rodriguez and another woman were present in the apartment. While the agents were searching the apartment, they heard shouting in Spanish from the street below. Defendants Martinez, and Alfonso along with Jose Gonzalez were seen together on the street near the apartment building. Martinez pointed to one of the agents and yelled in Spanish: "One for one. Leave the woman alone. She doesn't have anything to do with it." As Martinez was shouting, Alfonso and Gonzalez were scanning the block in both directions. Several federal officers announced themselves and started approaching the three men. All three men started to retreat and Gonzalez reached for the back of his waistband as if he were about to draw a gun. The officers ordered all three men to freeze. A loaded .38 caliber semi-automatic handgun was recovered from Gonzalez and a loaded .38 caliber handgun was recovered from defendant Alfonso. Defendant Martinez was unarmed. All three men were then arrested.

## DISCUSSION

### I. *Evelio Martinez* [2]

■ Martinez moves to suppress a statement that he made to a law enforcement official at some point after his arrest. When asked what he did for a living, Martinez responded that he was an "unemployed handyman." Martinez' motion is based on an alleged failure to advise him of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In support of the motion, defendant's counsel has submitted an affidavit asserting that defendant was not advised of his rights. Affidavit of Gerald M. LaBush dated January 7, 1986 ¶¶ 8, 9. The court need not reach the merits of this claim, nor must the court conduct a hearing to resolve factual disputes, however, because these assertions are unsupported by an affidavit from anyone with personal knowledge of the underlying facts. *See United States v. Gillette,* 383 F.2d 843, 848 (2d Cir.1967); *United States v. Barr,* 605 F.Supp. 114, 119 n. 2 (S.D.N.Y.1985); *United States v. Abrams,* 543 F.Supp. 1184, 1193 n. 11 (S.D.N.Y.1982). Further, Detective Rocco Sanfilippo submitted a sworn affidavit stating that *Miranda* warnings were given. Martinez' motion to suppress the statements is therefore denied.

### II. *Carmen Rodriguez*

Defendant Rodriguez has moved:

1) To suppress physical evidence;

2) To suppress oral statements;

3) To dismiss the indictment and disclose grand jury testimony; and

4) To compel the disclosure of an informant's name and address. [3]

### A. Motion to Suppress Physical Evidence

Rodriguez moves to suppress the evidence seized in the apartment, contending that the warrant issued by Magistrate Grubin was not based on probable cause. Rodriguez' motion is denied.

---

**2.** Martinez also moved to compel the government to file a bill of particulars; to compel discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure; to suppress oral statements; to suppress physical evidence seized

from a safe deposit box; and for a severance. Martinez withdrew these motions at a hearing.

**3.** Rodriguez also moved for a severance. This motion was withdrawn at a hearing.

Probable cause is a "commonsense, practical question" that must be decided when viewing the "totality of circumstances." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). It is a " 'practical nontechnical conception.' " *United States v. Young,* 745 F.2d 733, 745 (2d Cir.1984) (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)), *cert. denied,* — U.S. —, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). The standard is satisfied if there is a "fair probability," *Illinois v. Gates,* 462 U.S. at 246, 103 S.Ct. at 2336, that a search will yield evidence specified in the warrant. The fourth amendment requires only that the magistrate have a "substantial basis" for finding that the search would result in evidence of wrongdoing. *Id.* (citation omitted). Furthermore, the magistrate's finding of probable cause is entitled to " 'great deference,' " *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984) (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)); *accord Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331. The court should not scrutinize the sufficiency of the affidavit *de novo. Id.* In any close case, doubts are to be resolved in favor of the findings made by the magistrate. *Id.* at 237 n. 10, 103 S.Ct. at 2331 n. 10; *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983).

■ In this case, Magistrate Grubin had a substantial basis for issuing the warrant. The warrant was issued based on the telephonic application of Agent Errol Chavez, Group Supervisor of the Drug Enforcement Administration. Magistrate Grubin was told that Vargas advised the confidential informant that Vargas had spoken to Inez the night before the attempted burglary.[4] Chavez stated that he was informed that Inez told Vargas that ten kilograms of cocaine and $100,000 were in Hernandez'

apartment. Furthermore, Chavez told the Magistrate that Vargas knew Hernandez and had seen him wearing large amounts of expensive jewelry and heard him boasting about keeping money and drugs in the apartment. In addition, Agent Chavez advised the Magistrate that three persons had been arrested based on this information. The three men were searched and a gun, handcuffs, rope and two shields resembling New York Police Department shields were discovered. Lastly, Agent Chavez told Magistrate Grubin that after Vargas' arrest and after having been advised of his constitutional rights, Vargas again admitted, this time to the agents, that the three men were on their way to steal the cocaine and money. Vargas told the agents that he learned about the cocaine and money from Inez who told him that she was frequently in the apartment and had seen cocaine and cash in the apartment within the last few days.

Magistrate Grubin acted within her discretion in issuing the warrant based on these facts. As the government points out, not only was the Magistrate confronted with statements made by Vargas and Inez but Vargas and the other men demonstrated their strong belief in the truth of these statements by twice planning to burglarize the apartment. In short, Vargas' actions corroborated his statements.[5] This was all the corroboration that was possible under the circumstances because Hernandez allegedly was planning to deliver the cash to Miami the following morning.

Like many warrant applications, this application contains multiple hearsay; specifically, statements by Inez which were made to Vargas. Vargas then made these statements to the Informant who relayed them to the agent who in turn included the statements in the warrant application. Hearsay information in an affidavit can establish probable cause, however, if there is a substantial basis for crediting the hearsay.

---

4. Chavez had worked with the Informant in connection with numerous investigations and Chavez stated that the Informant had always proved to be truthful and reliable.

5. Vargas' statements to the law enforcement officials at the time of his arrest also corroborated his statements to the Informant.

*United States v. Zucco,* 694 F.2d 44, 46 (2d Cir.1982). The fact that there is multiple hearsay therefore does not render the statements by the agent incompetent. These statements may be considered if, under all the circumstances, they can be said to be trustworthy. *United States v. Kuntz,* 504 F.Supp. 706, 710–11 (S.D.N.Y. 1980); *see United States v. Fiorella,* 468 F.2d 688, 691 (2d Cir.1972), *cert. denied,* 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974).

Here, the Magistrate could have deemed the statements made by Vargas to the Informant in furtherance of the burglary to be reliable, not only because Vargas' actions corroborated his statements, but also because they were against Vargas' penal interest when made. *See United States v. Sporleder,* 635 F.2d 809, 812 (10th Cir. 1980). Furthermore, the Magistrate properly could have found Inez' statements reliable. Inez had detailed specific information regarding the whereabouts of the drugs, money and jewelry.[6] She also stated a specific quantity of drugs and money that were to be found. In addition, Inez had particularized personal knowledge regarding how long the contraband would remain in the apartment. Lastly, because Inez was Hernandez' girlfriend, she had an adequate basis to know this information. Thus, when taking a commonsense approach, giving great deference to the magistrate's determination, and viewing the totality of the circumstances, this court will not overturn Magistrate Grubin's determination. The motion to suppress physical evidence is therefore denied.[7]

**B. Motion to Suppress Oral Statements**

■ Rodriguez moves to suppress oral statements made after her arrest on the basis that no *Miranda* warnings were given. Besides an affidavit from the government agents stating that *Miranda* warnings were given, there is no affidavit submitted by someone with knowledge of the matters asserted. Accordingly, for the reasons stated above, see *supra* § I., Rodriguez' motion to suppress oral statements is denied.

**C. Motion for Examination of Grand Jury Minutes and to Dismiss the Indictment Based on Prosecutorial Misconduct**

Rodriguez moves to examine the grand jury minutes and dismiss the indictment based on prosecutorial misconduct before the grand jury. The misconduct alleged by Rodriguez is that evidence was not presented to the grand jury regarding Hernandez, Rodriguez' husband. Rodriguez asserts that according to the search warrant application, Hernandez was the focus of the government's investigation. She claims that absent this information regarding Hernandez, the grand jury would be misled regarding her role. Rodriguez contends that without seeing the grand jury minutes, she cannot adequately address the question whether the grand jury was fully apprised of the fact that it is Hernandez to whom all evidence points as being involved in any criminal conduct relating to the contraband.

■ To dismiss an indictment on this ground, the prosecutor must knowingly withhold substantial evidence negating

---

**6.** Vargas advised the confidential informant that Hernandez had the cocaine, cash, and jewelry secreted in a closet behind a false wall. Presumably, Vargas obtained this information from Inez.

**7.** The court has found Vargas and Inez to be reliable. Vargas' veracity was high because his statements were against interest and they were self-corroborating. Vargas' basis was unsound except to the extent of his own observations. Inez had a sound basis although her veracity was unknown. The Informant was merely a messenger with no personal knowledge and ac-

cording to Agent Chavez, his veracity was extremely high. Had the Informant claimed to posess first hand knowledge, more would have been required from Agent Chavez than a statement that the two had worked together and that the Informant had always been reliable.

Assuming *arguendo* that there was no substantial basis for issuance of the warrant, the court finds that there was objectively reasonable reliance on the warrant by the agent. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

guilt which, if presented, would " 'reasonably be expected to lead the jury not to indict.' " *United States v. Dyman*, 739 F.2d 762, 768 (2d Cir.1984) (quoting *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir.1979)), *cert. denied*, —— U.S. ——, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). It cannot be said that information inculpating one person in a conspiracy to violate the narcotics laws and with possession of a narcotic with intent to distribute it would *negate* the guilt of another person charged with those crimes. These are not the types of crimes where only one person or the other could have committed them. Both Rodriguez and Hernandez could have participated in the crimes charged. Thus, although it may be said that if the evidence was introduced the grand jury may have also indicted Hernandez, the court cannot say that the introduction of this evidence would have led the grand jury not to indict Rodriguez. Furthermore, Rodriguez has not shown any particularized need for the grand jury minutes. *See United States* v. *Moten*, 582 F.2d 654, 662 (2d Cir.1978). The motion to examine the minutes and dismiss the indictment are therefore denied.

### D. Identity of Informants

Rodriguez has moved to compel the government to identify or produce the Informant referred to in the search warrant affidavit and in the complaint.[8] She states that Vargas and many other persons made various statements to the Informant and therefore the Informant may possess knowledge of Hernandez' involvement in the drug field and of the activities which are the subject of the indictment. If the Informant is produced, defense counsel can then explore whether the Informant is a proper subject for subpoena. Rodriguez therefore asserts that the information attributed to the Informant will be helpful to the preparation of the defense.

The defendant bears the burden of demonstrating entitlement to the information. *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir.1983); *in re United States*, 565 F.2d 19, 23 (2d Cir.1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); *United States v. Payden*, 613 F.Supp. 800, 822 (S.D.N.Y.1985). The government's privilege to withhold an informer's identity gives way only where his identity is "relevant and helpful to the defense of the accused, or is essential to a fair determination" of his case. *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957); *United States v. Lilla*, 699 F.2d at 105. Mere speculation, however, that the informer may possibly be of some assistance does not overcome the strong public interest in protecting informants. *United States v. Prueitt*, 540 F.2d 995, 1003 (9th Cir.1976). Here, Rodriguez has shown no real need for disclosure of the Informant which would override the government's interest in protecting the Informant. She merely speculates as to the relevancy of the Informant's knowledge. Moreover, the facts of this case do not suggest that the informant would even have relevant information. *See United States v. Kelly*, 449 F.2d 329, 330 (9th Cir.1971). The Informant told the Drug Enforcement Task Force that Martinez and Hernandez owned the cocaine in the apartment. Although this information could arguably be exculpatory of Rodriguez, the Informant does not have first hand knowledge. As stated in the search warrant affidavit, the Informant obtained this information from Inez and Vargas. There is no indication that the Informant either participated in or was a material eyewitness to the criminal activities charged in the indictment or is otherwise needed for a fair determination of the issues at trial.[9] *Id.; United States v. Ziegler*, 325 F.Supp. 379 (E.D.Pa.1971). Any statement that the Informant might make

---

8. The Informant mentioned in the search warrant affidavit and the complaint are apparently the same person. The information attributed to the informant is the similar in both documents.

9. Unlike this case, *Roviaro* involved an informant who directly participated with the accused in the crime and witnessed it.

would be based on statements made by Inez and Vargas and would be inadmissible hearsay. The disclosure of the Informant's identity would thus not be helpful in preparing the defense.[10]

### III. *Ramon Alfonso*

Alfonso has moved:

1) To suppress the firearm found on him at the time of his arrest;

2) To sever his trial from that of his co-defendants; and

3) To dismiss the indictment based on a lack of evidentiary connection between Alfonso and the other defendants.

#### A. Motion to Suppress the Firearm

Alfonso moves to suppress the firearm found on his person when he was arrested. The government argues in its motion papers that the handgun was lawfully seized during a stop and frisk pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because the government submitted no sworn statement from a person with knowledge of the incident to support its *Terry* theory, a hearing was held on April 17, 1986 with Detective Rocco Sanfilippo testifying about the circumstances surrounding the seizure of the gun and the arrest of Alfonso.

It is well-settled that under certain circumstances a law enforcement officer may stop and question an individual to investigate criminal behavior "where the officer has a reasonable suspicion, based on specific, objective, and articulable facts, that the individual is involved in criminal activity."

*United States v. Delos-Rios*, 642 F.2d 42, 45 (2d Cir.), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981). Pursuant to that stop, a law enforcement officer, "for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or supects are then in the possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979).[11] In determining whether there are sufficient facts to warrant a reasonable suspicion to stop an individual, "the circumstances surrounding the stop must be viewed as a whole, not as discrete and separate facts" and these circumstances "are to be viewed through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States v. Delos-Rios*, 642 F.2d at 45. The stop and frisk must "entail the minimal degree of intrusion appropriate to the particular circumstances." *Id.*

Alfonso argues that he was searched *after* he was arrested and therefore probable cause was needed to search him. Alternatively, he argues that even if he was searched before he was formally arrested, the level of the agents' intrusion was so great that their actions constituted an arrest. He therefore argues that probable cause was needed to search him incident to that arrest. In either case, he argues that there was no probable cause to arrest him.

In support of Alfonso's first claim, that he was searched after the formal arrest, Alfonso argues that three drafts of investigative arrest reports as well as the complaint indicate that Alfonso, Gonzalez and

---

**10.** Rodriguez argues only that the Informant's identity would be helpful in preparing her defense. She does not demand that the informant be produced to challenge his credibility for purposes of attacking the search warrant. Accordingly, the court need not address the issue whether the informant need be produced for that purpose. In any event, there is generally a less compelling need to disclose the identity of an informant "when it is sought in connection with pre-trial issues such as the propriety of search or seizure, which do not bear upon the ultimate question of guilt or innocence." *United States v. Manley*, 632 F.2d 978, 985 (2d Cir.

1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).

**11.** A *Terry* stop, unlike a search incident to a lawful arrest is not justified by a need to prevent the disappearance or destruction of evidence of a crime. 392 U.S. at 29, 88 S.Ct. at 1884. The only justification for a frisk incident to a *Terry* stop is the protection of the police officer and others nearby, and it must thus be limited to intrusions reasonably designed to discover hidden instruments for the assault of the police officer. *Id.*

Martinez were searched after their arrest.[12] Detective Sanfilippo testified that he signed the drafts and the final report because they were accurate. He testified, however, that when the drafts and final report were prepared, the facts were not stated in exact chronological order. Specifically, Special Agent Sanfilippo testified that Alfonso was stopped and frisked before he was arrested.

Detective Sanfilippo testified that the following facts represent the correct chronology of events: Detective Sanfilippo and approximately five other officers were searching Hernandez' apartment when he heard loud noises and yelling down the street. Sanfilippo went to the window and observed three males who were later identified as Alfonso, Gonzalez, and Martinez outside in the street. Martinez was pointing up to the apartment and shouting "one for one" in Spanish. Detective Sanfilippo believed Martinez to be a narcotics trafficker. This conclusion was based on his four and one-half years of experience in drug enforcement and 17 years as a member of the New York Police Department, as well as the narcotics paraphernalia, pictures, documents and a photograph of Martinez which were recovered from Hernandez' apartment.[13] As Martinez was yelling, Gonzalez and Alfonso were standing three feet apart. It was 12:30 a.m. and no one else could be seen on the street.

Sanfilippo and Inspector John Spencer then went down to the street to investigate. The three men were standing in the street. Martinez was still pointing up to the apartment. Sanfilippo yelled "freeze" and the two officers, holding out guns, announced themselves. At that point, the three men were starting to retreat and Gonzalez reached for the back of his waistband in a manner that implied that he was armed and reaching for a gun. Detective Sanfilippo then yelled to his partner: "Watch out, I believe he has a gun." The three men were ordered to freeze again and Detective Fiore came out of the apartment with a shotgun to join the other two officers. Agent Chavez and another officer later joined the three agents on the street. The officers then threw the three men against a wall and ordered the men to put their arms on the wall and to spread their legs. The officers were pointing guns at the three men. Detective Sanfilippo then pulled a gun from Gonzalez' waistband. Gonzalez turned from the wall and was hit with the butt of a shotgun. His ear started to bleed. Detective Fiore simultaneously patted down Alfonso and pulled out a gun from his waistband. Alfonso was not hit at all and the gun was taken from him while he was in a standing position. Detective Sanfilippo unequivocally testified that the three men were not arrested until *after* the guns were removed. Further, he testified that no more than six to seven seconds elapsed from the time he yelled: "Police, freeze" to the time in which the gun was recovered from Alfonso. The court finds Agent Sanfillippo's testimony to be credible and accepts his testimony that Alfonso was not formally arrested until after the seizure of Gonzalez' gun.[14]

12. The first draft of the investigative report in pertinent part reads: "The three were placed under arrest. Two loaded pistols were recovered from Gonzalez and Alfonso." The second and third drafts read: "The three were then placed under arrest. Two loaded pistols were recovered from Gonzalez and Alfonso." The Complaint reads: "All three were searched incident to their arrest and loaded pistols were recovered from Gonzalez and Alfonso."

13. The complaint states that in the front hall closet, an attache case containing a checkbook in the name of Evelio Martinez was found. Further, records relating to Martinez' ownership of two cadillacs and one other vehicle were found. Adjacent to the attache, the agents found a loaded .38 caliber pistol. In a rear bedroom, a cuban passport in the name of Evelio Martinez was found.

14. While the complaint contradicts the testimony of Sanfilippo, the complaint was prepared by Chavez and Assistant United States Attorney Franklin Stone. The drafts of the investigation arrest reports prepared by Sanfilippo, although ambiguous and susceptible to the interpretation offered by Alfonso, do not on their face contradict Sanfilippo's testimony. The court has accepted Sanfilippo's testimony as a clarification of the reports.

The first inquiry is therefore whether the officers' intrusion was sufficiently minimal so that their actions constituted a "stop." If the intrusion was sufficiently minimal, then only "reasonable suspicion" would have been required to stop Alfonso. At that point, Alfonso could have been legally frisked if the officers observed conduct which lead them reasonably to conclude that Alfonso might have been armed and presently dangerous. *Terry v. Ohio,* 392 U.S. at 24, 88 S.Ct. at 1881. If the intrusion was so great as to constitute an arrest, however, probable cause would be needed to search incident to that arrest. *See United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982). Alfonso argues that there was no resistance on his part and that three officers with guns drawn was more than was required. He further argues that there were no particularized facts that would point towards his involvement in drug activity. In sum, he argues that the level of intrusion was greater than was necessary and was tantamount to an arrest.

The court finds that the officers' activity was minimally intrusive before the discovery of the gun and therefore only reasonable suspicion was needed to stop Alfonso. Before the gun was discovered, Alfonso's freedom to move was only restricted for a few seconds. *See United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985) (20 minute detention constitutes a "stop" rather than a search where police acted diligently); *United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2646, 77 L.Ed.2d 110 (1983) ("brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"); *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1978) (noting that *Terry* in- volved a "brief, on-the-spot stop on the street and frisk for weapons"); *United States v. Van Leeuwen,* 397 U.S. 249, 253, 90 S.Ct. 1029, 1032, 25 L.Ed.2d 282 (1970) (examined whether the investigation was conducted promptly). *Compare United States v. Place,* 462 U.S. at 709, 103 S.Ct. at 2646 (90 minute detention of defendant's luggage *per se* constitutes a search rather than a stop). Further, although Gonzalez was struck, Alfonso was not. Even had there been a threatening show of authority, however, this would still not have turned the stop into an arrest in this situation because the officers acted reasonably. Any show of force was justified by self protection. Lastly, there was no forced movement for purely coercive purposes. *See Pennsylvania v. Mimms,* 434 U.S. 106, 110–11, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam) (police protection suffi- cient reason for police to force suspect out of car for questioning); *accord New York v. Class,* —— U.S. ——, 106 S.Ct. 960, 967– 68, 89 L.Ed.2d 81 (1986). *Compare Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985) (police ac- tion constituted an arrest where rape sus- pect was brought to police station for fin- gerprinting); *Florida v. Royer,* 460 U.S. at 505, 103 S.Ct. at 1328 (defendant not mere- ly "stopped" when forced to accompany officers to a small police room approxi- mately 40 feet away); *Dunaway v. New York,* 442 U.S. at 207, 99 S.Ct. at 2253 (defendant was "seized" when he was in- voluntarily taken from a private dwelling into custody and transported to the police station for an interrogation lasting an hour). In sum, the intrusion was brief and narrowly circumscribed.

The officers had "reasonable suspicion" that Alfonso was engaged in criminal activ- ity and thus the stop was proper. Further- more, for the same reason that the officers were justified in stopping Alfonso—reason- able suspicion that he possessed a weapon and was involved in narcotics—they had reasonable grounds for self protection pur- poses to frisk him. The stop and the sub- sequent frisk must be viewed against a

background that comports with "the violent nature of narcotics crime." *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980); *see United States v. Barlin*, 686 F.2d at 87. Sanfilippo testified that in approximately 125 arrests that he made in the course of narcotics investigations, 75–80% of the arrestees carried loaded firearms; *accord United States v. Viserto*, 596 F.2d 531, 537 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). As in *Barlin*, Alfonso was not merely innocuously present in a public place. 686 F.2d at 87. *Compare Ybarra v. Illinois*, 444 U.S. at 92–93, 100 S.Ct. at 342–43 (defendant innocuously present in a bar). Rather, he was with Martinez who already was reasonably suspected by the agents be involved in narcotics. *See United States v. Barlin*, 686 F.2d at 87. Further, Alfonso, on an otherwise deserted street at 12:30 a.m., had been three feet from Gonzalez who was observed reaching for his waistband. The stop and frisk of Alfonso was supported by a reasonable belief that he was armed and presently dangerous. *Terry v. Ohio*, 392 U.S. at 21–24, 27, 88 S.Ct. at 1879–81, 1883; *see Ybarra v. Illinois*, 444 U.S. at 93, 100 S.Ct. at 343.[15] *Terry* allows the reasonably cautious police officer to prevent such potentially explosive situations without risking serious injury. *United States v. Barlin*, 686 F.2d at 87. Based on the above specific articulable facts, the officers' conduct was permissible.[16]

**B. Motion for Severance**

■ Alfonso seeks the severance contending that there will be prejudice caused by the "spill-over" effect of the narcotics transaction evidence offered against the other defendants. Rule 8(b) of the Federal Rules of Criminal Procedure provides that "[t]wo or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction." Alfonso is charged with conspiring to violate the narcotics laws. The count charging Martinez and Rodriguez with possession of narcotics with intent to distribute them relates to cocaine mentioned in overt act number one of the conspiracy count. Thus, there is no "spill over" since the possession of the cocaine may be established as part of Count One charging Alfonso with conspiracy.

**C. Motion to Dismiss the Indictment**

Alfonso moves to dismiss the indictment claiming that the government has not established any connection between Alfonso and the other defendants. This motion is not appropriate at the pretrial stage, rather it is to be done in the form of a Rule 29 Motion for Judgment of Acquittal. The government has not had an opportunity to present any evidence so that the court cannot determine whether any connection will be established. On its face, the indictment charging Alfonso is valid and will not be dismissed.

CONCLUSION

Defendants' motions are denied.

SO ORDERED.

---

**15.** In *Terry* the Court stated: "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of another was in danger. *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883.

**16.** Although the officers might have decided to secure Alfonso separately from Gonzalez, the court will not second guess his decision not to. Once Alfonso's gun was discovered, there was clearly probable cause to arrest him. Because of this court's holding that the police intrusion constituted a "stop" and that there was reasonable suspicion to stop and frisk Alfonso, the court need not decide whether the officers had probable cause to arrest Alfonso at the time Detective Sanfilippo observed the three men on the street. The court also need not address whether the officers would have had reasonable suspicion or probable cause to search Alfonso if Gonzalez had not been seen reaching for his waistband.